[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 16, 2002
THOMAS K. KAHN
CLERK

_____

No. 00-15858

_____

D.C. Docket No. 96-00279 CV-BU-S

VIRGIL LEE BROWNLEE,

Petitioner-Appellant,

versus

MICHAEL HALEY, Commissioner,
Alabama Department of Corrections,

Respondent -Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(September 16, 2002)

Before EDMONDSON, Chief Judge, and MARCUS and WILSON, Circuit Judges.

MARCUS, Circuit Judge:

Virgil Lee Brownlee appeals the district court's denial of his petition for a

writ of habeas corpus challenging both his 1987 conviction for the murder of

Lathen Aaron Dodd and the death sentence imposed as a result of that conviction by the Circuit Court for Jefferson County, Alabama. Although we agree with the district court that the underlying conviction was constitutionally firm, Brownlee plainly received ineffective assistance of counsel at sentencing in light of his attorneys' failure to investigate, obtain, or present to the jury any evidence in mitigation of the death penalty, violating the Sixth Amendment to the Constitution. Accordingly, we reverse the district court's order regarding sentencing and remand the case with instructions to issue a writ vacating Brownlee's death sentence.

## I.

The facts surrounding the death of Lathen Aaron Dodd are undisputed. At approximately 8:30 or 9:00 p.m. on Monday, May 19, 1986, three gun-wielding men stormed into Jodie's Lounge in North Birmingham, Alabama, yelling obscenities, firing their pistols, and ordering the bar's fourteen to eighteen customers to get down onto the floor. One of the three perpetrators remained by the door of the bar keeping guard over a man whom he had dragged in with him.

The other two perpetrators went further into the bar. There, any patrons who were not already lying down were forced to the ground. One patron suffered a broken shoulder from being thrown to the floor. After forcing all of the customers to the ground, the perpetrators continued to abuse them physically -- patrons were

2

hit on the head, kicked in the neck, hit with a gun, and pistol whipped. Once all of the customers were secured on the ground, two of the assailants robbed them of their possessions, including billfolds, money, jewelry, watches, identification cards, keys, credit cards, wallets, a duffel bag, a knife, and a gun. As the patrons were being robbed of their possessions, one of the perpetrators, who seemed to one witness to be in charge of the operation, demanded to know who the owner of the bar was. When Dodd identified himself, the robber ordered him to go to the cash register and give him its contents. After receiving the contents, this robber demanded to know where the rest of the money was. When he was told that there was no more money, the robber jumped on the bar and fired two shots, one of which sounded to one patron like it made a "body impact." After they had been robbed, the patrons were forced to crawl to the restroom at the back of the bar. While they were on the way to the bathroom, more shots were fired, one of which grazed a customer's head.

The perpetrators then left the scene. When the patrons emerged from the restroom, they discovered that Dodd had been shot in the abdomen. Dodd was then taken to the hospital, where he died on an operating table at 10:53 p.m. The cause of death was bleeding that resulted from a gunshot wound to the chest and abdomen.

A.

Shortly after the crime, the State of Alabama charged Virgil Lee Brownlee, Willie Irving Goodgame, and Robert Harris with the capital offense of murder during the course of robbery in the first degree, a violation of Ala. Code § 13A-5-40(a)(2).  Goodgame pled guilty and received a sentence of life imprisonment, and the State proceeded to trial first against Brownlee, and later against Harris.[1] Initially, attorney Herbert Massie was appointed to represent Brownlee, but his representation ended when Massie was suspended from the practice of law for failing to comply with his continuing legal education requirements.  In October 1986, Circuit Court Judge James H. Hard IV appointed attorneys Burton Dunn and James Kendrick to represent Brownlee.

At the three-day trial, which lasted from January 5-7, 1987, the State's witnesses included nine patrons of Jodie's Lounge, who described the robbery. None of these individuals linked Brownlee to the crime.  Although four of the patrons identified Goodgame as one of the perpetrators and one identified Harris, nobody who was in the bar could identify Brownlee as being present.  One customer testified that he thought he had seen Brownlee somewhere before, but he

---

[1]Following his separate trial, Harris was convicted of a capital offense for the robbery-murder and received a sentence of life imprisonment without the possibility of parole. See Harris v. State, 545 So. 2d 146 (Ala. Crim. App. 1989) (affirming conviction).

4

was not positive and could not say that Brownlee was at Jodie's Lounge. Notably, none of the patrons could say who shot and killed Dodd. In addition to the lack of any eyewitness testimony implicating Brownlee, the State presented no forensic evidence linking Brownlee to the crime in any way, and no bullet was recovered from Dodd's body.

The evidence implicating Brownlee consisted entirely of the testimony of co-defendant Goodgame and two uncharged individuals who claimed to be with Brownlee before and after (but not during) the crime: James "Sonny" Warren and Reavor Jones. Goodgame, who said that he had known Brownlee for about ten years at the time of the crime, testified that on the night of May 19, 1986, he was at Jones's apartment with Brownlee, Harris, Warren, Jones, and another man, Reginald Poe. According to Goodgame, Brownlee had sent Warren to pick up the other men and bring them back to Jones's, where they all used drugs. At around 7:00 or 7:30 that evening, Goodgame, Brownlee, and Harris went into a separate room of the apartment, at which time Brownlee told them that he knew of a "lick," meaning a place where they could get money. After discussing the plan, the three men equipped themselves with firearms, including a nickel-plated .357 Magnum with a brown handle for Brownlee and a silver, sawed-off .38 caliber pistol for Goodgame. Brownlee asked Warren if they could take his car, a blue Buick, but

5

Warren declined to loan them the vehicle and instead drove them to their destination.

Goodgame testified that the men arrived in Warren's car at an alley behind Jodie's Lounge, but that Warren became nervous and drove them all back to Jones's apartment, where they talked before returning to the alley behind the lounge. Fifteen minutes before the men entered the bar to commit the robbery, Goodgame went in to look it over, at which time he bought two bags of potato chips. Once he returned outside and as the three men waited to enter the lounge, a man pulled up in a van. Goodgame testified that he, along with Brownlee and Harris, decided to take this man into the bar with them. After the man broke free from their initial grasp and tried to run away, Goodgame caught him. By this time, according to Goodgame's testimony, Brownlee and Harris were already in the bar. Therefore, Goodgame brought the man to the door of the bar and threw him onto the floor inside.

Goodgame testified that he remained at the door of the lounge throughout the course of the robbery, which lasted about ten minutes. Although he said that he saw Brownlee in the middle of the bar's floor area, Goodgame acknowledged that he did not see anybody shoot Dodd. He said that when the robbery ended, the men left the bar, with Brownlee carrying a tote bag, and returned to the car, where

6

Warren was waiting. Upon returning to Jones's apartment, Brownlee, Goodgame, and Harris went into the bedroom and started dividing up the contents of Brownlee's bag, including clothes, billfolds, rings, watches, and $500 to $600 in cash. Goodgame said that he received a necklace and some money, and that there was a .38 caliber firearm lying on the bed.

According to Goodgame, the men then sent Jones to buy cocaine, and everyone in the apartment used cocaine, as well as "T's and blues."[2] Goodgame testified that he was in the bedroom with Jones for some of this time, but that when he emerged he heard Poe saying "I didn't know you all had shot nobody." Goodgame asked, "who got shot?," and Poe explained, "Harris just told Brownlee that he didn't have to shoot," to which, according to Goodgame, Brownlee responded "I had to shoot the mother fucker cause he went for his pistol." Goodgame also testified that, on the following day, in a conversation with Warren, Jones, and Goodgame about a newspaper article, Brownlee made such statements as, "if I wouldn't have shot him, he would have shot me." Goodgame said that he and Brownlee went to the creek behind Jones's apartment and threw in the

---

[2]"T's and blues" refers to a combination of talwin, an addictive pain reliever, and an antihistamine.

billfolds, identification cards, and other items of no value. He also said that he went with Brownlee to sell the pistols to an individual named "Big Bull."[3]

On cross-examination, Goodgame, who was identified by four patrons (Simon Hill, Jannie Surovec, B.A. Tidwell, and John Brown) as having been seen inside Jodie's Lounge, insisted that he did not actually go into the bar, but rather stayed outside and pushed the captive man inside. He also said that Brownlee's gun was black, after observing on direct examination that it was nickel-plated. Goodgame further testified on cross-examination that he told the police on the day of his arrest, June 5, 1986, that Brownlee had a .357, even though the police report indicated that Goodgame said Brownlee carried a short-barrel silver .38. Goodgame conceded that he was high on cocaine when he heard Brownlee admit to the shooting and that he had initially told the police that Brownlee carried stolen goods in his pocket upon leaving the crime scene, although he said at trial that Brownlee had a tote bag.

---

[3]At trial, Birmingham police officer Jimmy Brown testified that the patrons' items were indeed recovered from the creek, but no finger prints could be obtained from any of them. Also at trial, a man named Booker T. Harris testified that he obtained pistols from Goodgame some time before the summer of 1986. Another person was with Goodgame, but Harris did not really see him. Officer Roosevelt Smith of the Birmingham police obtained the pistols from Harris, and they were admitted into evidence. Police investigating the crime scene at Jodie's Lounge recovered a .38 caliber bullet, but the parties stipulated that the bullet was not fired from either of the guns introduced in the case.

Some portions of Goodgame's testimony were corroborated by Warren and Jones, but other material portions were contradicted. Warren testified that, around 3:30 or 4:00 p.m., he went to Jones's apartment to get money that he was owed by Brownlee, Harris, and Goodgame. At Brownlee's request, he drove to pick up Goodgame, Poe, and Harris, arriving back at the apartment around 5:00 or 5:30. Warren said that, at approximately 8:30 or 9:00 p.m., Brownlee, Harris, and Goodgame left in his car. Contrary to Goodgame's testimony, Warren said that he stayed at the apartment. According to Warren, no drugs were consumed before the other men left. When they left, Brownlee carried a .357, Goodgame had a sawed-off .38, and Harris had a standard .38.

Warren testified that the men returned approximately two hours later, with Goodgame carrying a gym bag and Brownlee carrying a paper bag. Brownlee, Goodgame, and Harris went into the bedroom, where they stayed for 45 minutes. When Warren went into the bedroom, he saw identification cards, jewelry, and money on the floor and bed. When the men came out of the room, he saw a gun that they did not have with them when they left. Brownlee and Harris initially argued about a necklace, but they resolved their dispute and everyone began using cocaine and T's and blues. Warren first claimed that he used only marijuana, but admitted later in his testimony that he also used cocaine that night. After Harris

9

almost overdosed on drugs, Warren decided to stay at the apartment overnight, so Jones drove him to work in the morning.

Warren further testified that on the following Friday, four days after the crime, he asked Brownlee about the Jodie's Lounge murder, which he had read about in a newspaper article entitled "Bar robbed, owner killed." After Warren said to Brownlee, "I know you -- that didn't happen with my car," Brownlee responded, "it's good that you was that observant." Warren testified that Harris was present for this conversation, which took place at Jones's apartment, and that Goodgame came in later. The men told Warren not to worry because his car was not seen. Warren also testified that he heard nothing about any murder on the day of the crime, although he did notice that two rounds were missing from Harris's blue .38 after the incident. When Warren asked Harris about this, Harris said, "oh, yeah, about that capping," and then cut himself off and said, "forget it." Warren stated at trial that he received some money from Brownlee on the night of the crime as compensation for an auto transmission problem that began when Goodgame had been using the car on a previous day. When Brownlee had asked Warren for the car on the night of the crime, he told Warren that he would make sure that Goodgame paid him.

Jones, who is Warren's cousin and was Brownlee's girlfriend at the time, testified that Brownlee, Harris, Goodgame, Warren, and another man were all at her apartment around 5:00 p.m.[4] At some point, Brownlee, Harris, and Goodgame left in Warren's car. Also undermining Goodgame's testimony, Jones said that Warren stayed at the apartment. She said that when the three men returned between one hour and ninety minutes later, Goodgame had a brown paper sack and a gun, and there was nothing in Brownlee's hands. The three men went into a room for fifteen to twenty minutes, and they emerged carrying jewelry, as Brownlee and Harris argued about a necklace. Jones testified that all three men discussed shooting into the air. Although Jones denied that she obtained any drugs, she stated that she used drugs along with Warren, Brownlee, Harris, Goodgame, and the other individual at her house for almost the whole night. Finally, Jones testified that Brownlee stayed at her apartment after everyone else left, but that there was no discussion about what had happened.[5]

---

[4]Jones was unclear in her testimony about the identity of the fifth man. Although she said early in her testimony that it was Reginald Poe, she said later that she was not sure of his name since that was the first time she had met him.

[5]Neither Warren nor Jones was asked about the conversation on the day after the crime during which, according to Goodgame, Brownlee allegedly said "if I wouldn't have shot him, he would have shot me."

11

At trial, Brownlee did not testify and the defense offered no evidence.  On January 7, 1987, the jury returned a verdict finding Brownlee guilty of capital murder.  Separate sentencing proceedings commenced the following morning.

B.

In Alabama, the jury that decides a defendant's guilt also sits in the first phase of a bifurcated sentencing proceeding, in which it issues an advisory sentencing verdict based on its evaluation of aggravating and mitigating circumstances. See Ala. Code § 13A-5-46.  If the jury finds that no aggravating circumstances exist, or that any aggravating circumstances do not outweigh the mitigating circumstances, it must return an advisory verdict recommending life imprisonment without parole. See id. § 13A-5-46(e)(1)-(2).  If, on the other hand, the jury finds one or more aggravating circumstances and determines that they outweigh the mitigating circumstances, it must recommend the death penalty. See id. § 13A-5-46(e)(3).  Any verdict recommending death must be based on a vote of at least ten jurors, while a recommendation of life imprisonment requires only a majority. See id. § 13A-5-46(f).  If the jury can reach neither verdict, a mistrial is declared and another sentencing jury is empaneled. See id. § 13A-5-46(g).

After the jury has returned its advisory verdict at the sentencing phase, the trial judge orders and receives a presentence investigation report, hears further

12

arguments, and may receive additional evidence concerning the aggravating and

mitigating factors. Taking into account all of the evidence, including that

introduced at trial and in the sentencing proceeding before the jury, the court must

then enter written findings with regard to the aggravating and mitigating

circumstances. See id. § 13A-5-47(d). Like the jury, the trial judge must determine

whether any aggravating circumstances exist and, if so, whether those aggravating

circumstances outweigh any mitigating circumstances that it may find. In reaching

its ultimate decision, the trial court "shall consider the recommendation of the jury

contained in the advisory verdict, unless such a verdict has been waived" by the

defendant. Id. § 13A-5-47(e).

At the time of Brownlee's sentencing, Alabama's criminal code enumerated

eight aggravating circumstances, see Ala. Code § 13A-5-49,[6] as well as seven non-

_____

[6]The eight statutory aggravating factors were: "(1) The capital offense was committed by a person under sentence of imprisonment; (2) The defendant was previously convicted of another capital offense or a felony involving the use or threat of violence to the person; (3) The defendant knowingly created a great risk of death to many persons; (4) The capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary or kidnapping; (5) The capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; (6) The capital offense was committed for pecuniary gain; (7) The capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws; or (8) The capital offense was especially heinous, atrocious, or cruel compared to other capital offenses."

13

exclusive mitigating circumstances, see id. § 13A-5-51.[7]  In addition to the listed

mitigating factors, the statute explains that "mitigating circumstances shall include

any aspect of a defendant's character or record and any of the circumstances of the

offense that the defendant offers as a basis for a sentence of life imprisonment

without parole instead of death." Id. § 13A-5-52.

In this case, the State offered evidence of two aggravating circumstances at

the sentencing proceeding before the jury.  First, in order to show that "[t]he

defendant was previously convicted of another capital offense or a felony

involving the use or threat of violence to the person," id. § 13A-5-49(2), the State

presented a stipulation, agreed to by defense counsel, that Brownlee had previously

been convicted of four counts of robbery, one on June 23, 1980, and three on

October 9, 1980.[8]  Second, in order to show that "[t]he capital offense was

_____

[7]The seven statutory mitigating factors were: "(1) The defendant has no significant history of prior criminal activity; (2) The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance; (3) The victim was a participant in the defendant's conduct or consented to it; (4) The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor; (5) The defendant acted under extreme duress or under the substantial domination of another person; (6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and (7) The age of the defendant at the time of the crime."

[8]Defense attorney Burton Dunn decided to stipulate to the prior convictions after realizing that his name appeared as the prosecutor on the case action sheets for the prior cases. Evidence produced in the post-conviction proceedings, discussed below, indicated that Dunn was not actually involved in the prior cases, but was listed only because he held a supervisory position at the district attorney's office.  Nevertheless, Dunn testified later that he stipulated to the convictions in part to prevent the jury from seeing his name on the documents and to avoid

14

committed by a person under sentence of imprisonment," id. § 13A-5-49(1), the State presented the testimony of Billy Cox, Brownlee's parole officer, who said that Brownlee had been placed on parole on March 31, 1986, and that he remained on parole on the date of the crime.[9]

At the sentencing hearing before the jury, Brownlee's counsel presented no evidence. Instead, each of his lawyers offered only a very brief closing argument. Together, the statements of defense attorneys Dunn and Kendrick take up just over five pages of the trial transcript. Dunn, who spoke first, began his argument by saying, "I am not going to rehash or go back over the trial. You have obviously resolved the issue of guilt against us. I am simply standing up here before you at this time to ask for Virgil Brownlee's life." After conceding that Brownlee had prior convictions and was on parole at the time of the crime, Dunn explained to the jury that, despite his involvement in this crime and his own series of prior convictions, co-defendant Goodgame was receiving only life imprisonment, with the possibility of parole, while Brownlee was facing the death penalty. Dunn then said that

---

any confusion or negative inferences that might have been drawn therefrom.

[9]The Alabama Court of Criminal Appeals has held that the phrase "under sentence of imprisonment" includes being on parole. See Tarver v. State, 500 So. 2d 1232, 1250-51 (Ala. Crim. App.), aff'd, 500 So. 2d 1256 (Ala. 1986).

the State of Alabama on Virgil Brownlee, under the same facts that Goodgame participated in, is asking you to sentence this man to the electric chair. I don't say it is easy, but it isn't hard for [Assistant District Attorney Donald] Russell to do that, because Mr. Russell doesn't know that man. He is just an object. Just like he is to you. You have never had the opportunity to talk to him, be around him or to know him as a human being, and the lawyers have. So, he is not just an object to us. He is a person.

Sure, he has done wrong. Hasn't always obeyed the law, lived outside of the law a good part of his life. But he is still a person. A living, breathing, human being.

And regardless of the fact that he has committed a crime, I still feel for him.

Dunn went on to observe that "killing [Brownlee] is not going to bring Mr. Dodd back," that "[l]ife without parole in this State means just exactly that," and that state prisons are "pretty terrible." Finally, he said that there is "[n]o point in haranguing you. You are either going to do it or you're not. I just beg you not to. . . . Virgil's family is back there. They feel for him. They love him, just like Mr. Dodd's folks loved him," before concluding "please don't kill him. That is all I can say. Thank you."

Speaking after Dunn, Kendrick emphasized that even though they had "already made [the] decision as far as the guilt or innocence," the jurors should note not only that Goodgame received a lighter sentence than death, but also that Warren was not charged at all despite being "an accomplice to this crime."

16

Kendrick explained that "the evidence established there is no question [Goodgame] was in that bar. He could just as easily have been the trigger man as any of the other two," and that the disparate treatment of the co-participants in the crime "is just inherently unfair." Like Dunn, Kendrick noted that Brownlee's family was sitting in the courtroom and that "Mr. Brownlee's family loves him just like Mr. Dodd's family loved him, and they'll be just as devastated at his death as Mr. Dodd's family was when he died." Kendrick concluded, "I don't know anything else I can add. I just say under the circumstances, I don't see how you can sentence this man to the electric chair."

After hearing the prosecutor's final statement and the court's penalty phase instructions, the jury deliberated for 38 minutes before recommending a sentence of death by an 11-1 vote.

Prior to the second phase of the sentencing proceeding, Judge Hard suggested that defense counsel contact Dr. William Beidleman, a clinical psychologist, to conduct an examination of Brownlee. At the February 24, 1987 judicial sentencing hearing, the defense presented Dr. Beidleman and two of Brownlee's sisters as witnesses. Dr. Beidleman, who examined Brownlee at the

county jail nine days before the hearing and performed a variety of tests,[10] opined that "Mr. Brownlee has a mixed substance abuse disorder, in remission [due to his incarceration], a mixed personality disorder, and borderline intellectual functioning." The doctor explained that Brownlee had an IQ of 70, which is classified as "in the mild mental retardation range," but that his adaptive intelligence indicated that "his skills were somewhat higher." Therefore, he classified Brownlee as having borderline intellectual functioning, "which is out of the retarded range, but still impaired." The doctor also noted that Brownlee was "not actively psychotic" and that "[t]here was no evidence of a thought disorder or severe mood disturbance" even though he was "somewhat suspicious and paranoid."

Based on Brownlee's statements and interviews with Brownlee's sisters, Dr. Beidleman reported that Brownlee had seen visions and suffered from "hypnagogic hallucinations," which consist of "experiences right before you fall asleep or right upon awakening of seeing threatening figures or animals." He also observed physical complaints such as hot flashes in the chest, which "were sort of strange and often go along with psychosis." Dr. Beidleman saw some indication that

---

[10]The tests included the Ammons & Ammons Quick Test, the Minnesota Multiphasic Personality Inventory ("MMPI"), the critical items scale, incomplete sentences blank adult forms, and the Rogers Criminal Responsibility Assessment scale.

18

Brownlee exaggerated in order to portray himself in a negative light, and he also noted hypervigilance and paranoia common in convicted individuals. In addition, Dr. Beidleman testified about Brownlee's extensive history of drug abuse and stated that, if Brownlee's reports were true, "his level of intoxication would [have been] significant" at the time of the crime. He also noted that Brownlee had received an undesirable discharge from the army for drug abuse and related conduct, and that Brownlee had undergone past treatment for psychiatric problems and seizures.

Dr. Beidleman was followed by two of Brownlee's sisters, Maryann Andrews and Gail Brownlee. Andrews testified that shortly after Brownlee left the military, he was taken to a psychiatric hospital following an incident in which he chased his family members out of the apartment, threw a television out the window, and jumped out of the second floor apartment window. When family members got to him, Brownlee "was on the floor with his chest all cut up." Brownlee did not stay at the psychiatric hospital following his visit because his mother could not afford the costs. Andrews also testified that her brother "has always had mood changes" since leaving the military, but that he has never hurt anyone and had helped raise his niece. Gail Brownlee also testified about her brother's seizures, which occurred between 1973 and 1975, when he was around

19

twenty years old, and included forcing family members out of the apartment and harming himself by jumping out the window and cutting himself in the chest. Before trying to harm himself, Brownlee complained about headaches and said that "he couldn't take the pain anymore."

After hearing this testimony and receiving a presentence investigation report, the trial court found the existence of three aggravating circumstances and no mitigating factors. The aggravating circumstances were Brownlee's four prior convictions, the fact that he was on parole at the time of the crime, and the fact that "[t]he capital offense was committed while the defendant was engaged in . . . the commission of . . . robbery." Ala. Code § 13A-5-49(4). Based on this determination, the judge sentenced Brownlee to die.

After his sentencing, Brownlee moved the trial court for a new trial based on newly-discovered evidence. The new evidence consisted of the testimony of two women, Angie Flowers and Eveolene Fowler, who claimed to have seen Brownlee across town from Jodie's Lounge right before and right after the robbery and shooting. In response, the state presented the testimony of Assistant District Attorney Russell, who said that Brownlee had told him in a post-conviction meeting that he was in fact in Jodie's Lounge during the shooting, but that he was

under a pool table robbing a patron of his beeper when the fatal shots were fired.

The trial court denied the motion for a new trial.

Judge Hard appointed Kendrick alone to represent Brownlee on appeal after

Dunn asked to be relieved from further duties on the case.  Kendrick raised seven

issues on appeal,[11] but the Alabama Court of Criminal Appeals upheld the

conviction and sentence on June 28, 1988. See Brownlee v. State, 545 So. 2d 151

(Ala. Crim. App. 1988).  The Alabama Supreme Court affirmed this ruling on

March 10, 1989, see Ex parte Brownlee, 545 So. 2d 166 (Ala. 1989), and the

United States Supreme Court denied Brownlee's petition for a writ of certiorari on

October 2, 1989, see Brownlee v. Alabama, 493 U.S. 874, 110 S. Ct. 208, 107 L.

Ed. 2d 161 (1989), as well as his request for rehearing the following month, see

Brownlee v. Alabama, 493 U.S. 986, 110 S. Ct. 527, 107 L. Ed. 2d 527 (1989).

---

[11]These seven issues were: (1) whether the trial court erred by striking for cause jurors who said that they would be reluctant to impose the death penalty, but could under the right circumstances; (2) whether the testimony of the accomplices was sufficiently corroborated by other evidence, as required by Alabama law; (3) whether Brownlee was so intoxicated at the time of the offense that he could not be held accountable; (4) whether the evidence was sufficient to sustain a capital conviction; (5) whether the trial court should have granted a new trial based on newly-discovered alibi evidence; (6) whether the trial court erred in failing to remove for cause a juror who had personal contact with the victim; and (7) whether the state improperly called attention at trial to Brownlee's decision to remain silent after his arrest.

C.

Assisted by new counsel, Brownlee then filed a petition for post-conviction relief in the state court pursuant to Rule 32 of the Alabama Rules of Criminal Procedure.[12] The petition's 37 grounds for relief included, <u>inter alia</u>, claims that defense counsel performed ineffectively during the trial, sentencing, and appeal; that Goodgame's admission that he lied in his testimony required a new trial; that Dunn operated under a conflict of interest because of his prior prosecution of Brownlee; that portions of the trial were not transcribed; and that Goodgame was not sworn before he testified. Brownlee also raised various arguments regarding the alleged unconstitutionality of the Alabama death penalty law, both facially and as applied to him. Judge Hard conducted extensive hearings regarding the petition.

In order to support his ineffective assistance of counsel claim, Brownlee sought to show that counsel devoted little time to preparing for either the guilt or sentencing phases. Brownlee testified at the Rule 32 hearing that, before the trial, Dunn met with him only two times for 10 to 15 minutes each, and Kendrick met with him three or four times for 15 to 20 minutes each. Neither attorney asked him anything about his personal background, his psychiatric disorders, his limited

---

[12]The petition was filed pursuant to Rule 20 of the Temporary Alabama Rules of Criminal Procedure, but the permanent rules became effective during the pendency of the petition, and Rule 20 became Rule 32.

intellectual ability, his extensive drug and alcohol abuse, his family history, or his extensive history of blackouts and seizures. In addition, neither attorney investigated his alibi claim that he was robbing a drug house at the time of the Jodie's incident, and neither attorney discussed with him the trial procedure or evidence for the sentencing phase.

When they testified, Dunn and Kendrick acknowledged that they had conducted no pre-trial discovery, but they explained that such actions would have been unnecessary since they had full access to all of the district attorney's files, including witness statements. The attorneys also acknowledged that they conducted virtually no investigation into Brownlee's personal history, having had only one conversation with one of Brownlee's sisters, which Mary Ann Andrews said was not until just prior to the sentencing proceeding before Judge Hard. The lawyers did not have Brownlee examined by a psychologist until the court suggested it after the jury sentencing phase because they did not believe that Brownlee had any mental problems. In fact, Dunn observed his client to be of "above average intelligence." Furthermore, counsel did not probe Brownlee's drug problems because they believed that a Jefferson County jury would not be sympathetic to an account of voluntary drug use.

23

Brownlee also introduced evidence to suggest that trial counsel could have offered substantial evidence of mitigating circumstances if they had investigated their client's background. Mary Ann Andrews and Gail Brownlee, the sisters who testified at the sentencing proceeding before the trial court, testified in more detail about Brownlee's personal history, and Brownlee himself testified as well. The testimony showed that, from the time he was nine or ten years old, Brownlee lived in the Kingston housing project, a high-crime area of Birmingham. One morning, soon after moving to Kingston, Brownlee was stabbed in the chest while on his way to the store to buy bread, and he had to be taken to the hospital. On another occasion, in the mid-1970s, Brownlee was shot multiple times and taken to a local hospital, where his sisters and mother went to see him.

Both sisters discussed in detail the multiple seizures that they had already described in the judicial sentencing proceeding. They also provided more information about the incident in which, as described by Andrews, Brownlee threw the television out the window, "tore up" everything in the house, "cut his chest like criss-crossed all the way down," and ended up convulsing on the floor with "his eyes rolled back in his head." Gail Brownlee described another incident in which her brother tried to jump out the window of the apartment and their mother attempted to grab him by a foot and arm to keep him inside. Despite her efforts,

24

Brownlee fell to the ground, suffering injuries. On the whole, Gail Brownlee witnessed a number of her brother's seizures, which occurred as often as once a month and included uncontrollable shaking and foaming at the mouth. Along with the sisters' accounts, Brownlee presented the testimony of Maxine Maguire Driver, a nurse who lived next door to the family. Driver saw Brownlee suffer seizures three times. On the first occasion, she had to use a spoon to prevent him from swallowing his tongue. Aside from their discussions of his seizures, both sisters described Brownlee as a devoted member of the family who was particularly close to and helpful in raising Gail's daughter Daphne. Despite Brownlee's incarceration, Gail described him as the closest thing Daphne has to a father.

Like the sisters, Dr. Beidleman offered a far more detailed version of his earlier testimony. Based on additional tests administered in preparation for the Rule 32 hearing, including the full MMPI, the critical items scale, and the competency screening test, as well as his earlier analysis and a review of psychiatric records and prison files, Dr. Beidleman diagnosed Brownlee as having either mild mental retardation or borderline intellectual functioning and suffering from various mental disorders, including schizotypal personality disorder, antisocial personality disorder, multiple drug dependencies, and seizure disorder or

epilepsy.[13]  With regard to Brownlee's intellectual functioning, Dr. Beidleman explained that Brownlee's IQ is "in the range of 67, 68, 75," which is "right on the borderline between having severe social and occupational impairment due to limited intellectual resources and being able to cope in a sort of mildly adaptive manner."  He emphasized that Brownlee was "right on the edge."  The doctor described schizotypal personality disorder as an illness marked by thought disturbance, paranoid ideation, suspiciousness, and social anxiety, and often including unusual physical experiences, poor interpersonal relationships, and depressed, flat speech.  He described antisocial personality disorder as a "chronic pervasive condition" involving a history of rule-breaking dating back to childhood, followed by irresponsibility and antisocial behavior later in life, often including drug and alcohol abuse.

Based on Brownlee's long history of drug and alcohol abuse, which, according to Brownlee, included cocaine, heroin, and other hallucinogenic drugs dating to his teenage years, Dr. Beidleman diagnosed him as a "polypharmacy individual" who "will take anything he can get."  In his testimony, Dr. Beidleman

---

[13]The psychiatric records included documents from Cooper Green and Mercy Hospital and from a private psychiatrist, Dr. Green.  Brownlee went to the hospital and was seen by Dr. Green in the mid-1970s, when his family members took him for treatment following his seizures. Gail Brownlee testified that her brother stopped seeing the private doctor because the treatment was too expensive.

explained that Brownlee's serious problems with drugs compounded the problems caused by his substantial intellectual limitations and other psychiatric disorders, and even possibly diminished his mental capacity at the time of the crime. The doctor stated that "it is quite possible" that his seizure disorder and other personality disorders are related to alcohol and drug abuse. He also noted that the seizures, which were confirmed by hospital records from the mid-1970s, could have been connected to an earlier head injury, especially in light of hospital records indicating that Brownlee was shot in the head around that time.

Dr. Beidleman further testified that he believed Brownlee was unlikely to engage in violent behavior in prison, where the ability to make his own decisions would be confined and access to alcohol and drugs would be limited. A similar opinion was offered by Frederick Freeman, a correctional officer who supervised Brownlee in 1983 and 1984 and observed that "[h]e conducted himself as a model inmate" who posed no security threat.

Aside from the testimony regarding the claims of ineffective assistance, much of the evidence presented at the Rule 32 proceedings concerned Goodgame's recantation and Dunn's alleged conflict of interest. Regarding the recantation, the central piece of evidence considered by the court was deposition testimony in which Goodgame said that he was pressured by the district attorney and his own

attorney to implicate Brownlee in order to avoid being sentenced to death himself. After first refusing to provide any information, Goodgame said in the deposition that he robbed Jodie's Lounge not with Brownlee and Harris, but rather with two other individuals from out of town, one of whom was named Ron.

Additionally, Brownlee presented the testimony of Marty Lee George and James Louis Threat, two inmates who served in prison with Goodgame and heard him say that Brownlee was not involved in the crime and that he lied in order to avoid the electric chair. Despite his claims of official pressure, however, Goodgame testified that the assistant district attorney did not tell him to lie, and he also said that he never told his attorney about the involvement of the men from out of town. At the hearing, both of Goodgame's attorneys, Assistant District Attorney Russell, District Attorney David Barber, and Lieutenant Carl Quinn all testified that they did not tell Goodgame to testify untruthfully in order to avoid the death penalty.

As for the alleged conflict of interest, the state presented evidence showing that, despite being listed on the case action sheets, defense counsel Dunn did not actually prosecute Brownlee earlier, in 1980. Dunn testified that, as a deputy district attorney at the time, he supervised three attorneys in his division, including Doug Valeska and Don Colee, and the fact that the cases were assigned to those

28

lawyers could explain why his name appeared on the documents. Dunn said that he was "a hundred percent positive" that he had "absolutely no contact" with Brownlee prior to his appointment in the instant case. A court reporter reviewed his notes from the earlier proceedings and testified that Brownlee was prosecuted by Colee in February 1980 and Valeska in May 1980, and that Dunn was not at counsel table for the state. In an affidavit submitted to the court, Valeska said that he prosecuted Brownlee himself and that Dunn did not assist him or participate. Furthermore, Brownlee's defense attorney from that time, Charles Howard, recalled having no dealings with Dunn.

After hearing all of the evidence, the trial court denied Brownlee's Rule 32 petition. Judge Hard's opinion included a determination that counsel did not perform ineffectively at either trial or sentencing. With regard to the sentencing hearing, the judge determined that counsel had a strategy for the sentencing phase "centered around the weakness of the State's case and the emotional and personal plea to spare [Brownlee's] life," and held that "[c]onsidering trial counsel's knowledge of Brownlee's background there simply were no mitigating circumstances that could be presented by him to the jury and the strategy of counsel was the most reasonable under the circumstances." The trial court further opined that the testimony of Dr. Beidleman and Brownlee's sisters, if presented to

the jury, "would only have conflicted with and weakened the credibility of trial counsel's strategy which was based on the weakness of the State's case." The court also noted that the evidence of Brownlee's drug use would not have changed the outcome of the proceedings and that the evidence of good behavior in prison was undermined by his admission in the Rule 32 proceeding that he had used drugs during his current incarceration. The court's discussion of Brownlee's numerous other claims included the factual finding that Goodgame's trial testimony was not perjured, a determination that Dunn had no conflict of interest, and the conclusion that Brownlee had procedurally defaulted his claims alleging that Goodgame was not sworn in for his testimony and that parts of the trial were not transcribed.

The Alabama Court of Criminal Appeals affirmed the trial court's denial of the Rule 32 petition on January 13, 1995, see Brownlee v. State, 666 So. 2d 91 (Ala. Crim. App. 1995), and the Alabama Supreme Court denied his petition for certiorari on July 21, 1995.

On February 6, 1996, Brownlee filed the instant petition for a writ of habeas corpus in the United States District Court for the Northern District of Alabama. In an amended petition, he raised the same 37 claims that he had raised in his state Rule 32 motion. The district court denied Brownlee's motion on August 9, 2000. After rejecting Brownlee's claims of ineffective assistance of counsel in the guilt

or innocence phase of the trial, the court discussed in detail the claim that counsel performed ineffectively at sentencing. Determining that counsel's failure to investigate or present mitigating evidence to the jury was not based on <u>any</u> reasonable strategy, the court held that counsel's performance was deficient under the first prong of the test established by the Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The district court held, however, that Brownlee was not entitled to any relief since he could not show prejudice under the second prong of <u>Strickland</u>. Specifically, the court held that the trial judge's subsequent consideration and rejection of the mitigating evidence cured any defects in the jury phase, especially in light of the strong evidence of aggravating factors and the central role afforded to judges in Alabama's capital sentencing scheme. The court noted that most of the mitigating evidence presented by Brownlee was in fact before Judge Hard at the time of sentencing and that this evidence was not so significantly mitigating that the failure to present it to the jury undermined confidence in the outcome of Brownlee's sentencing, as required by <u>Strickland</u>. After rejecting the ineffective assistance claim regarding sentencing, the district court went on to deny the claim of ineffective assistance of appellate counsel.

The district court also rejected the claim regarding Goodgame's recantation and Dunn's conflict of interest in light of the state trial court's findings of fact in the Rule 32 proceeding. It further dismissed as procedurally defaulted a number of Brownlee's other claims, including those involving the alleged failures to swear Goodgame or transcribe a portion of the trial.

Appealing the district court's denial of habeas corpus relief, Brownlee now raises six claims regarding his conviction and five claims regarding the imposition of the death penalty. Challenging his conviction, Brownlee argues that: (1) he received ineffective assistance of counsel at the guilt/innocence stage of his trial and on appeal; (2) the district court violated his rights by failing to inquire on the record about Dunn's conflict of interest; (3) the district court wrongly determined that Goodgame's recantation was not a basis for a new trial; (4) the district court erroneously decided that he had procedurally defaulted the claim that Goodgame was not sworn before testifying; (5) the district court incorrectly determined that his claim that the trial was not fully transcribed was procedurally defaulted; and (6) the trial was tarnished by racial discrimination.

Challenging the death sentence, Brownlee contends that: (1) he received ineffective assistance of counsel at the penalty phase of the state court proceedings; (2) the sentencing proceeding was tarnished by racial discrimination; (3) the death

penalty is applied in Alabama in an arbitrary and racially discriminatory manner;

(4) the Constitution prohibits the execution of mentally retarded individuals; and

(5) the Constitution bars execution by electrocution.

## II.

We examine the claims regarding Brownlee's conviction before turning to

his death sentence. In so doing, we review the district court's denial of habeas

corpus relief de novo. See Dorsey v. Chapman, 262 F.3d 1181, 1185 (11th Cir.

2001). As in other contexts, the district court's findings of fact are reviewed for

clear error, see O' Ryan Castro v. United States, 290 F.3d 1270, 1272 (11th Cir.

2002), while legal questions and mixed questions of law and fact are reviewed de

novo, see Tinker v. Moore, 255 F.3d 1331, 1332 (11th Cir. 2001). Whether a

defendant received ineffective assistance of counsel is a mixed question of law and

fact, and we therefore review it de novo. See Hagins v. United States, 267 F.3d

1202, 1204 (11th Cir. 2001). Similarly, we analyze de novo the mixed question of

whether an attorney labored under a conflict of interest. See Freund v.

Butterworth, 165 F.3d 839, 862 (11th Cir. 1999). We also conduct de novo review

of a district court's decision to deny habeas corpus relief on the basis of a

procedural default. See Caniff v. Moore, 269 F.3d 1245, 1246 (11th Cir. 2001).

Further, although this appeal is not governed by the more stringent standards established by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), 28 U.S.C. § 2241, et seq., because it was filed prior to the April 24, 1996 effective date of that law, findings of fact made by the state trial court in the Rule 32 proceedings are nevertheless entitled to a "presumption of correctness," Freund, 165 F.3d at 861. This presumption, which is based on the principle of comity and the understanding that federal habeas review is limited to analyzing claims of constitutional error, mandates considerable deference to state court findings of fact. See Marshall v. Lonberger, 459 U.S. 422, 432, 103 S. Ct. 843, 850, 74 L. Ed. 2d 646 (1983) ("This deference requires that a federal habeas corpus court more than simply disagree with the state court before rejecting its factual determinations. Instead, it must conclude that the state court's findings lacked even fair support in the record.") (internal quotations omitted).

## A.

Brownlee first argues that his conviction should be overturned because his counsel performed ineffectively by failing to prepare adequately for the guilt/innocence phase of his trial and by committing various unprofessional errors during that proceeding. We examine claims of ineffective assistance of counsel

under the Sixth Amendment through the two-part analysis set forth by the Supreme

Court in Strickland. Under this test, the petitioner must first show that "counsel

made errors so serious that counsel was not functioning as the 'counsel' guaranteed

. . . by the Sixth Amendment." Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. If

this substantial showing is made, the petitioner must then demonstrate that "the

deficient performance prejudiced the defense," which "requires showing that

counsel's errors were so serious as to deprive the defendant of a fair trial, a trial

whose result is reliable." Id. As the Supreme Court has explained, "[u]nless a

defendant makes both showings, it cannot be said that the conviction . . . resulted

from a breakdown in the adversary process that renders the result unreliable." Id.

In evaluating the first, or "performance," prong of Strickland, "[j]udicial

scrutiny of counsel's performance must be highly deferential." Id. at 689, 104 S.

Ct. at 2065. Because retrospective evaluation of a lawyer's performance can be

difficult, "a court must indulge a strong presumption that counsel's conduct falls

within the wide range of reasonable professional assistance; that is, the defendant

must overcome the presumption that . . . the challenged action might be considered

sound trial strategy." Id. (internal quotations omitted). A petitioner must identify

specific acts or omissions that were not the result of reasonable professional

judgment, and a court should deem these acts or omissions deficient only if they

35

"were outside the wide range of professionally competent assistance." Id. at 690, 104 S. Ct. at 2066. Simply put, the deference afforded an attorney's decision is great and the bar for proving a Sixth Amendment violation is high. In light of the "strong presumption in favor of competence," we have held that in order to prove deficient performance, "a petitioner must establish that no competent counsel would have taken the action that his counsel did take." Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

Under the second, or "prejudice," prong of Strickland, a petitioner must "affirmatively prove prejudice" by showing that counsel's errors "actually had an adverse effect on the defense." 466 U.S. at 693, 104 S. Ct. at 2067. This requires a showing of more than "some conceivable effect on the outcome of the proceeding." Id. Instead, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S. Ct. at 2068. Although this standard is difficult to meet, it is significant that a petitioner must show only a reasonable probability that the outcome would have been different; he "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." Id. at 693, 104 S. Ct. at 2068. When evaluating this probability, "a court hearing

36

an ineffectiveness claim must consider the totality of the evidence before the judge or jury." Id. at 695, 104 S. Ct. at 2069.

Brownlee argues that his attorneys, Dunn and Kendrick, performed ineffectively before trial by failing to: (1) speak with his initial attorney, Herbert Massie, who had apparently done significant preparatory work; (2) obtain a ballistics expert; (3) visit the scene of the crime; (4) talk to witnesses; (5) investigate the criminal records of the alleged co-participants in the offense; and (6) investigate Brownlee's alibi. He emphasizes that, by their own admissions, Dunn and Kendrick spent little time preparing for the trial and made only minimal efforts to obtain discovery materials.

As the district court determined, however, none of the alleged pre-trial errors can meet the demanding standard set forth in Strickland and Chandler. First, with regard to Brownlee's claim that counsel failed to speak with his initial attorney or conduct adequate pre-trial investigation, the record reveals that, even though they did not file any discovery motions, Dunn and Kendrick had complete access to all of the State's evidence and investigative materials as a result of the district attorney's office's "open file" discovery policy. This evidence was extensive, and Brownlee does not identify any information that counsel would have obtained if they had conducted more pre-trial discovery. Without doing any investigative

37

work of their own, Dunn and Kendrick had access to all statements given to the police by the patrons of Jodie's Lounge, the statements of Goodgame, Jones, and Warren, photographs and a diagram of the crime scene, and transcripts of the preliminary hearing. Counsel was clearly able to prepare for trial based on the large volume of materials made available by the State. Indeed, Dunn and Kendrick testified in the post-conviction proceedings that they were not surprised by any of the evidence or testimony presented by the prosecution at trial.

Quite simply, Brownlee's claims do not satisfy either prong of Strickland. Counsel's decision to rely on the extensive material made available by the district attorney's office did not fall outside the wide range of professional competence, and Brownlee's failure to demonstrate that further discovery would have helped the defense clearly bars a finding of prejudice. As we have explained, "[s]peculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation." Aldrich v. Wainwright, 777 F.2d 630, 636 (11th Cir. 1985).

Similarly, the district court correctly held that counsel was not ineffective for failing to investigate or present Brownlee's alibi that he was robbing a "dope house" at the time of the Jodie's Lounge incident. As we explained in Chandler, "counsel need not always investigate before pursuing or not pursuing a line of

defense. Investigation (even a nonexhaustive preliminary investigation) is not required for counsel reasonably to decline to investigate a line of defense thoroughly." 218 F.3d at 1318. The decision whether to present a line of defense, or even to investigate it, "is a matter of strategy and is not ineffective unless the petitioner can prove that the chosen course, in itself, was unreasonable." Id.

The evidence adduced at the state post-conviction proceedings reveals that sound strategy supported counsel's decision not to pursue the alibi. First, as Kendrick testified, counsel considered the claim particularly weak in light of Brownlee's initial assertion that the people robbing the dope house with him were Goodgame and Harris. Goodgame admitted that he was at Jodie's Lounge at the time of the robbery, and both he and Harris were identified by bar patrons as being there during the crime. Although Brownlee testified in the Rule 32 hearing that men named Kenny and Gene could corroborate his alibi, the trial court credited Kendrick's testimony that Brownlee never told him about these individuals. The state court's credibility determination is entitled to a presumption of correctness on habeas review, see, e.g., Coulter v. Herring, 60 F.3d 1499, 1503 (11th Cir. 1995), and Brownlee offers no reason to disregard this presumption. The weakness of Brownlee's alibi is further revealed by his failure to provide the location of the dope house he was purportedly robbing, and by the fact that, after trial, he told

Kendrick and the assistant district attorney that he was in fact present at Jodie's Lounge during the crime, but that he did not shoot Dodd. The attorneys' decision not to pursue Brownlee's alibi defense after deeming it implausible and unlikely to succeed is precisely the kind of strategic decision on which a court should defer to the judgment of counsel. See Chandler, 218 F.3d at 1318.

In addition to his claims of error before the trial, Brownlee contends that counsel committed a number of errors during the trial itself, including failing to: (1) object to Goodgame's testifying without being sworn; (2) have the whole trial transcribed; (3) object to the exclusion of Goodgame's conviction for unlawful possession of a handgun; and (4) inform the jury that Goodgame could have been convicted under Alabama's habitual offender statute. We are unpersuaded by these claims, either standing alone or in concert. First, the claim regarding the fact that Goodgame was not sworn fails because the Rule 32 court found, after reviewing the court reporter's notes and cassette tape, that Goodgame was in fact sworn before giving his testimony. This factual finding is entitled to a presumption of correctness, see Freund, 165 F.3d at 861, and Brownlee has offered no basis on which to conclude that the finding lacks "fair support in the record," Marshall, 459 U.S. at 432, 103 S. Ct. at 850.

40

Brownlee's second claim of ineffective assistance at trial also fails. Even if we assume that Dunn and Kendrick knew that portions of the proceedings were not transcribed and that their failure to rectify the situation somehow rose to the level of deficient performance, Brownlee has not shown, and indeed cannot show, that any omissions from the trial transcript hindered his ability to defend himself or appeal his conviction, or that the omissions in any way undermine confidence in the outcome of the proceedings. See Strickland, 466 U.S. at 697, 104 S. Ct. at 2069 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

As for the third claim of ineffective assistance during the trial, the State does not deny that the jury was not informed about Goodgame's 1984 conviction for attempted possession of a handgun by a person convicted of a crime of violence, in violation of Ala. Code § 13A-11-72(a). The district court correctly determined, however, that, even if the defense lawyers were deficient for failing to bring this conviction to the jury's attention, Brownlee suffered no prejudice. Despite not hearing about that one conviction, the jury knew about Goodgame's two other

41

convictions for theft of property in the third degree, in violation of Ala. Code § 13A-8-5, his participation in the Jodie's Lounge robbery, and the fact that he was testifying pursuant to a plea agreement that covered not only the Jodie's Lounge incident, but also eight other pending charges (including four robbery charges, two burglary charges, a theft charge, and a receipt of stolen property charge). Especially in light of concerns about Goodgame's motivations raised by defense counsel during cross-examination and closing argument, this information provided a strong basis for the jurors to question the credibility of the State's key witness. Moreover, the cross-examination brought out several material factual discrepancies in Goodgame's testimony, including whether Goodgame had entered the bar during the robbery and murder. Because so much evidence about Goodgame's past bad acts, incentives to testify for the State in this case, and questionable credibility had been presented, we are satisfied that evidence of one additional conviction was not likely to have had a meaningful impact at trial.

Similarly, Brownlee did not suffer any prejudice as a result of counsel's alleged failure to bring to the jury's attention that, had he not reached a plea agreement with the State, Goodgame could have been sentenced to life imprisonment without parole (even if not convicted of a capital offense) pursuant to Alabama's Habitual Felony Offender Act ("HFOA"), Ala. Code § 13A-5-9.

First, as the district court noted, Brownlee's argument is legally incorrect because Goodgame's prior convictions all involved misdemeanors and therefore did not render him subject to mandatory life imprisonment under the HFOA, which specifically applies only to offenders with multiple <u>felony</u> convictions. Second, even if Goodgame had avoided the HFOA by pleading guilty, Brownlee suffered no prejudice from his lawyers' failure to present this fact to the jurors, who plainly were informed about Goodgame's past crimes and his incentive to testify in the instant case in order to avoid the death penalty. Thus, as with Brownlee's other claims of ineffective assistance of counsel at trial, we remain unpersuaded.[14]

Brownlee also asserts that he received ineffective assistance of appellate counsel. However, he provides no support for this argument and points to no arguments that Kendrick should have raised in challenging his conviction. We therefore have no basis on which to grant relief, especially in light of the

---

[14]Brownlee also contends that his lawyers were ineffective for failing to take steps to have Warren and Jones charged with participation in the crime. This claim clearly fails. First, it is not apparent how Dunn and Kendrick, as defense attorneys, could have had these individuals charged. The power to prosecute is reposed in the executive branch of government. <u>See, e.g.</u>, <u>Bordenkircher v. Hayes</u>, 434 U.S. 357, 364, 98 S. Ct. 663, 668, 54 L. Ed. 2d 604 (1978) (explaining that prosecutor has broad authority to decide "whether or not to prosecute" an individual, and that the decision "generally rests entirely in his discretion"); <u>Crawford v. State</u>, 548 So. 2d 615, 618 (Ala. Crim. App. 1989) (discussing broad authority of district attorney in deciding whom to prosecute). Second, as the Court of Criminal Appeals explained, Warren and Jones were not accomplices as a matter of law, so Brownlee could not have benefitted from the Alabama law prohibiting convictions based solely on the uncorroborated testimony of accomplices. <u>See</u> <u>Brownlee</u>, 545 So. 2d at 159-61.

significant latitude afforded appellate counsel in "winnowing out weaker arguments on appeal and focusing on those more likely to prevail, [which,] far from being evidence of incompetence, is the hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536, 106 S. Ct. 2661, 2667, 91 L. Ed. 2d 434 (1986) (internal quotations omitted).

B.

In a claim related to his argument that he received ineffective assistance of counsel, Brownlee also says that the trial court violated his Sixth Amendment right to counsel by failing to conduct an on-the-record inquiry into Dunn's alleged conflict of interest. Although the case action sheets listing Dunn as Brownlee's prosecutor in the 1980 cases were not brought to the trial court's attention until the sentencing stage, Brownlee appears to argue that Dunn's representation was tainted throughout the proceedings. According to Brownlee, the trial court erred by conducting only an off-the-record conversation with counsel at which it was decided that the jury should not see the case action sheets. Brownlee argues that the court was required by Holloway v. Arkansas, 435 U.S. 475, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978), and Duncan v. Alabama, 881 F.2d 1013 (11th Cir. 1989), to advise him of the conflict, its potential effect, and his right to new counsel, and to

44

inquire whether he wished to obtain new counsel or waive the conflict. We remain

unpersuaded.[15]

Although judges are required to inform defendants and inquire about their

preferences if they learn of conflicts of interest at trial, no such obligation exists if

there is in fact no conflict. See, e.g., Cuyler v. Sullivan, 446 U.S. 335, 347, 100 S.

Ct. 1708, 1717, 64 L. Ed. 2d 333 (1980) ("Unless the trial court knows or

reasonably should know that a particular conflict exists, the court need not initiate

an inquiry."). A conflict exists when counsel "actively represented conflicting

interests." Id. at 350, 100 S. Ct. at 1719.

In this case, Brownlee simply cannot show that a conflict of interest existed

because the state trial court squarely rejected the factual predicate that Dunn

prosecuted Brownlee in the earlier criminal proceedings. Although Dunn's name

appeared on the case action sheets, he explained, in testimony credited by the trial

judge, that he was listed on the sheets simply because he was serving at the time as

a deputy district attorney with supervisory responsibility for the attorneys who

actually handled the prosecutions. Dunn testified in the Rule 32 proceedings that

---

[15]The State suggests that Brownlee's conflict of interest claim is procedurally defaulted because Brownlee never raised it at trial or on direct appeal. We disagree, as this claim was in fact raised to the trial court and again to the Alabama Court of Criminal Appeals in the Rule 32 proceedings. The Court of Criminal Appeals, like the district court on the instant petition, addressed the claim on the merits without deeming it procedurally defaulted. See Brownlee, 666 So. 2d at 95-97.

he was "positive" that he had no contact with Brownlee during the earlier cases, and the court reporter testified, based on his trial notes, that Assistant District Attorney Colee prosecuted Brownlee in February 1980, and Assistant District Attorney Valeska did so in May 1980. In an affidavit, Valeska said that Dunn did not assist or participate in the May 1980 case. Furthermore, Brownlee's attorney at the time recalled no dealings with Dunn, and even Brownlee has never said that Dunn was involved in his earlier case.

Based on the overwhelming evidence, we have no basis to disturb the presumption of correctness afforded the state court's factual determination that Dunn was never personally involved in prosecuting Brownlee.[16] We therefore agree, as a matter of law, that no conflict of interest existed. Brownlee has made no showing that Dunn had inconsistent interests simply because he worked in the district attorney's office at a time when Brownlee was prosecuted years earlier. See, e.g., Freund 165 F.3d at 859 ("An actual conflict occurs when a lawyer has inconsistent interests.") (internal quotations omitted). Clearly, Brownlee has shown nothing more than a "speculative or merely hypothetical conflict," which "does not suffice" to establish a Sixth Amendment violation. Mills v. Singletary,

---

[16]Although we review the ultimate determination regarding a conflict of interest de novo, we still afford a presumption of correctness to the state court's findings of historical facts related to the alleged conflict. See Freund, 165 F.3d at 862.

161 F.3d 1273, 1287 (11th Cir. 1998) (quoting <u>Lightbourne v. Dugger</u>, 829 F.2d

1012, 1023 (11th Cir. 1987)).  His claim therefore fails.[17]

---

[17]Even if Brownlee could show that Dunn operated under a conflict of interest, he would still not prevail on his Sixth Amendment claim.  In order to void a conviction on the basis of a conflict of interest, "it [is] at least necessary . . . for [a] petitioner to establish that the conflict of interest adversely affected his counsel's performance." <u>Mickens v. Taylor</u>, -- U.S. --, 122 S. Ct. 1237, 1245, 152 L. Ed. 2d 291 (2002). In order to prove adverse effect, a petitioner must show (1) a plausible alternative defense strategy that counsel might have pursued; (2) that the alternative strategy was reasonable; and (3) some link between the actual conflict and the decision to forego that strategy. <u>See</u> <u>Freund</u>, 165 F.3d at 860.  Brownlee does not even attempt to link counsel's alleged conflict with any deficiencies in the pre-trial or guilt/innocence stages of his case.  Therefore, any presumed conflict would not present a basis on which to overturn Brownlee's conviction.

C.

As he did throughout the Rule 32 proceedings, Brownlee argues again that he is entitled to relief because Goodgame, the key witness against him, has disavowed his testimony implicating Brownlee. In his deposition and in the Rule 32 hearing, Goodgame testified that he lied about Brownlee's involvement in order to save his own life and that he committed the Jodie's robbery with two men from out of town, not Brownlee and Harris. Brownlee's argument fails for two simple reasons. First, the state court has already considered Goodgame's recantation and rejected it as not being credible. Second, the recantation of testimony against a petitioner is not a basis for federal habeas corpus relief.

After considering Goodgame's testimony and that of the other witnesses presented, the state trial judge found Goodgame's recantation "unworthy of belief." This conclusion is amply supported by the record. As the trial judge noted in denying Brownlee's Rule 32 petition, Goodgame's recantation was vague and riddled with implausibilities. Despite claiming that he was directed to lie by his attorney and attorneys for the State, Goodgame ultimately admitted that he was never told to say anything other than the truth at trial. Goodgame also acknowledged that he never told his attorney that anybody from out of town was involved in the crime, that he knew only the first name of one of his purported co-

participants, and that he did not know even the first name of the other man. The state trial court also questioned the credibility of James Threatt and Marty Lee George, the two inmates who testified that Goodgame told them in prison that Brownlee was not involved in the crime. On the other hand, the court found credible the testimony of Kendrick and Russell that Brownlee told them he was in fact in Jodie's Lounge, even though he denied shooting Dodd, as well as the testimony of Goodgame's lawyers, who said that Goodgame was not told to lie on the stand. As the district court observed, there is absolutely no reason to disturb the state court's finding that Goodgame's trial testimony was not perjured and that his recantation was not credible.

Finally, even if Goodgame's recantation were credible (and the trial court has squarely found that it was not), the Supreme Court has held that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." Herrera v. Collins, 506 U.S. 390, 400, 113 S. Ct. 853, 860, 122 L. Ed. 2d 203 (1993). It is not our role to make an independent determination of a petitioner's guilt or innocence based on evidence that has emerged since the trial. "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in

violation of the Constitution -- not to correct errors of fact." Id. Brownlee alleges no independent constitutional violation relating to Goodgame's recantation, and he is therefore entitled to no federal habeas relief on this claim.

D.

Brownlee's claims that Goodgame was not sworn before testifying, that the trial was not fully transcribed, and that the trial was tarnished by racial prejudice are procedurally defaulted. Under the procedural default doctrine, we will not consider on federal habeas corpus review a claim that was not adequately presented to the state court in compliance with the state's procedural requirements. See Edwards v. Carpenter, 529 U.S. 446, 451, 120 S. Ct. 1587, 1591, 146 L. Ed. 2d 518 (2000). This doctrine is "grounded in concerns of comity and federalism," Coleman v. Thompson, 501 U.S. 722, 730, 111 S. Ct. 2546, 2554, 115 L. Ed. 2d 640 (1991), and is based on the principle that "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance," id. at 732, 111 S. Ct. at 2555.

There are only two ways for a petitioner to overcome a procedural default and receive federal review of claims not properly presented to the state court. Under the "cause and prejudice" exception, we require a petitioner to "demonstrate

cause for the default and actual prejudice as a result of the alleged violation of federal law." Id. at 750, 111 S. Ct. at 2565. Under the "fundamental miscarriage of justice" exception, we will review a claim only if "the habeas petitioner can demonstrate a sufficient probability that our failure to review his federal claim will result in a fundamental miscarriage of justice." Edwards, 529 U.S. at 451, 120 S. Ct. at 1591. The latter exception applies only in the "narrow class of cases," Schlup v. Delo, 513 U.S. 298, 315, 115 S. Ct. 851, 861, 130 L. Ed. 2d 808 (1995) (quotations omitted), in which the petitioner can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent," id. at 327, 115 S. Ct. at 867 (quotations omitted).

The Alabama procedural rules relevant to this case are codified as part of Rule 32 of the Alabama Rules of Criminal Procedure, which establishes and sets forth the rules for post-conviction relief in the state courts. At the time Brownlee's Rule 32 petition was reviewed, Rule 32.2(a)(3) stated that a petitioner cannot receive post-conviction relief based on any ground "[w]hich could have been but was not raised at trial," and Rule 32.2(a)(5) barred relief based on any ground "[w]hich could have been but was not raised on appeal." Ala. R. Crim. P. 32.2(a) (1995). If an Alabama court has denied post-conviction relief based on the petitioner's failure to raise a claim at trial or on direct appeal, a federal court

51

cannot review that claim unless it determines either (1) that the petitioner had cause for his failure to raise the claim and suffered prejudice as a result, or (2) that denying federal habeas review of the claim would result in a fundamental miscarriage of justice -- namely the conviction and punishment of one who is actually innocent.

The district court correctly determined that the claims regarding the alleged failures to swear Goodgame and transcribe the full trial are procedurally defaulted under Rules 32.2(a)(3) and (5) because they were not raised either at trial or on appeal. Recognizing this default, Brownlee argues that the "cause and prejudice" exception should apply because ineffective assistance of trial and appellate counsel prevented him from raising the claims. In order to receive the "cause and prejudice" exception based on a claim of ineffective assistance, a petitioner must show that counsel's performance was "so ineffective as to violate the Federal Constitution." Edwards, 529 U.S. at 451, 120 S. Ct. at 1591. In other words, a petitioner seeking to show ineffective assistance as the cause of a default must prove that his counsel was ineffective under the exacting Strickland standard. If he cannot prevail on a separate ineffective assistance of counsel claim, then he cannot prevail on an argument that ineffective assistance caused the procedural default. See id. It is abundantly clear, for the reasons discussed above, that Brownlee

cannot show that his lawyers were ineffective for failing to raise claims about the alleged failures to swear Goodgame or transcribe the full trial. Therefore, Brownlee's failure to present the issues in the state court cannot be excused, and the procedural default applies.

The procedural default governing the racial bias claim is slightly different, but equally valid. Although it is true that, like the other procedurally defaulted claims, this claim was not raised at trial or on direct appeal, the Court of Criminal Appeals rejected it on the ground that it was abandoned. Brownlee did raise the issue before the trial court in the Rule 32 proceedings, but he did not expressly include it in his appellate brief challenging the denial of his Rule 32 motion. Instead, he stated in a footnote of the brief that he was preserving all of the issues raised in his initial Rule 32 petition. As the Court of Criminal Appeals noted, this footnote was insufficient to preserve an issue under Alabama law. See Brownlee, 666 So. 2d at 93; see also Burks v. State, 600 So. 2d 374, 380 (Ala. Crim. App. 1991) ("Errors assigned and not argued will be treated as abandoned. Issues listed in [a] brief but not argued will not be reviewed on appeal. Allegations not expressly argued on appeal are deemed by us to be abandoned.") (citations, quotations, and punctuation omitted). Plainly, this ruling constituted a dismissal of the claim on a procedural ground, thus barring federal habeas review.

Brownlee does not contest the determination that the claim was abandoned. Instead, as with the other claims, he argues that the "cause and prejudice" exception should apply because counsel was ineffective for failing to preserve properly his racial bias claims, which include contentions that the prosecutor made prejudicial remarks and that African-Americans were improperly stricken from the jury in violation of Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). We disagree. Counsel was not ineffective for failing to raise these issues because they clearly lack merit. As the trial court found in its Rule 32 ruling, and the district court agreed, nothing in the prosecutor's remarks during the trial indicates any sign of racial bias. Furthermore, trial counsel stated in post-conviction testimony credited by the trial judge that there appeared to be no basis for a Batson challenge. Since Brownlee cannot show that counsel was ineffective for failing to preserve this issue, he cannot overcome the procedural default.[18]

Because all of the claims challenging the conviction are either without merit or procedurally defaulted, we agree with the district court that Brownlee is not entitled to habeas corpus relief vacating the conviction.[19]

---

[18]As an additional matter, we note that even if Brownlee could show that his trial counsel was ineffective for failing to preserve these claims, he has made no attempt to excuse his post-conviction counsel's apparent failure to raise the issue in the Rule 32 appellate brief.

[19]We reject Brownlee's additional claim that the district court erred in declining to conduct an evidentiary hearing on his petition. On habeas review, "[a] petitioner is entitled to an

III.

Although we agree with the district court's determination that Brownlee's conviction should not be vacated, a thorough review of the record and governing law compels a different conclusion with respect to the sentence of death imposed by the state court. Because counsel's failure to investigate, obtain, or present any evidence of mitigating circumstances to the sentencing jury constituted ineffective

evidentiary hearing in federal court if he alleges facts which, if proven, would entitle him to relief." Cave v. Singletary, 971 F.2d 1513, 1516 (11th Cir. 1992) (citing Townsend v. Sain, 372 U.S. 293, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963)). Because state court findings of fact are entitled to a presumption of correctness, however, a federal court should conduct a hearing on factual questions only if the state did not conduct "a full, fair, and adequate hearing." Routly v. Singletary, 33 F.3d 1279, 1284 (11th Cir. 1994) (quoting 28 U.S.C. § 2254(d)(6)). The petitioner bears the burden of establishing the need for an evidentiary hearing in federal court. See id.

Brownlee does not, and indeed cannot, deny that he received an evidentiary hearing on his Rule 32 claims in the state court. Instead, he argues that the hearing resulted in inadequate findings of fact because the state court merely adopted verbatim a proposed order submitted by the State. Even though Brownlee is correct that we have criticized the verbatim adoption of proposed orders, the Supreme Court and this Court have consistently upheld the use of such orders as long as they were adopted after adequate evidentiary proceedings and are fully supported by the evidence. See, e.g., Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S. Ct.1504, 1511, 84 L. Ed. 2d 518 (1985); United States v. El Paso Natural Gas Co., 376 U.S. 651, 656, 84 S. Ct. 1044, 1047, 12 L. Ed. 2d 129 (1964); Ammons v. Dade City, 783 F.2d 982, 984 n.4 (11th Cir. 1986). As in Ammons, the extensive record from the Rule 32 proceedings in this case "eliminates any doubt about the [trial] judge's involvement in the matter and careful analysis of . . . [the] evidence." Ammons, 783 F.2d at 984 n.4.

Brownlee's argument that he should have received an evidentiary hearing is further undermined by his failure to identify any evidence that he would have presented that could have supported his petition to vacate the conviction. As for his challenge to the conviction, Brownlee has failed to show that the district court abused its discretion in denying an evidentiary hearing. See Breedlove v. Moore, 279 F.3d 952, 959 (11th Cir. 2002) ("We review a district court's decision to deny an evidentiary hearing for an abuse of discretion."); see also Routly, 33 F.3d at 1284.

55

assistance of counsel, Brownlee is entitled to habeas corpus relief and a new sentencing proceeding consistent with the Sixth Amendment's command that a defendant receive the effective assistance of counsel.

## A.

The standard for ineffective assistance of counsel remains the same in the sentencing portion of a capital case as it is at the guilt/innocence phase. Again, in order to prove a Sixth Amendment violation, a petitioner must show first that counsel performed deficiently, and second that the deficient performance prejudiced the defense. See Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. Brownlee's primary claim of ineffective assistance at sentencing is that counsel failed to investigate or present any evidence of mitigating circumstances to the jury, especially in light of a lengthy and significant record of mitigating circumstances. Brownlee argues that if counsel had presented in the jury phase evidence of his personal history, specifically including his serious psychiatric problems and substantial intellectual limitations as well as his long history of drug and alcohol abuse, the jurors would have found mitigating circumstances and also determined that the mitigators were not outweighed by the aggravating circumstances. In that case, the jury would have recommended life imprisonment instead of death.

56

The State responds that any deficiency in counsel's performance at sentencing was not prejudicial for two reasons. First, it contends that the evidence supporting mitigating circumstances, which was introduced by Brownlee in the Rule 32 proceedings, would not have convinced the jury to recommend life imprisonment instead of death. Second, the State argues that even if counsel's deficiency might have affected the sentencing jury's advisory verdict, any error was necessarily cured when the trial judge, who had ultimate sentencing authority under Alabama law, considered Brownlee's mitigating evidence and still chose to impose a sentence of death. Brownlee counters that a failure to present evidence in the jury phase of an Alabama capital sentencing cannot be cured by presenting evidence to the judge, who, under the Alabama sentencing scheme, is required to "consider" the jury's recommendation.

On appeal, the State notably does not contest the district court's determination that counsel performed deficiently under the first prong of Strickland by failing to investigate or present any evidence of mitigating circumstances at the jury phase of the sentencing. Indeed, in response to questions from the panel at oral argument, counsel for the respondent said that the State was litigating the appeal solely on the prejudice prong and conceded that "[w]e're not contesting the district court's finding of deficient performance." In light of the

State's concession, we do not have before us the question of whether counsel performed deficiently, and we accept, for purposes of this appeal, the district court's determination that counsel's performance was in fact "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066.

This concession is not surprising in view of the district court's finding that "[t]he evidence shows [Brownlee's] attorneys failed to conduct any kind of substantive investigation into his background or character for purposes of presenting potentially mitigating evidence at sentencing until after the jury returned its advisory verdict, and that such constituted deficient performance within the meaning of Strickland." The district court plainly disagreed with the state court's determinations that there was no mitigating evidence to present and that the decision to present no mitigating evidence was strategic. With regard to the existence of mitigating evidence, the district court explained that "Brownlee's counsel had not done any investigation into Brownlee's background or character, so they did not know what evidence there might have been to present" and that "virtually any evidence shedding light on a defendant's background, character, or prospects for rehabilitation or adjustment to prison life is relevant to mitigation and is to be considered by the sentencer when offered." In addition, the district court

expressly rejected the argument that the decision to present no mitigating evidence was strategic, noting that Dunn and Kendrick "did not . . . pursue a penalty phase strategy emphasizing residual doubt," and that counsel in fact based much of their argument on the "emotional and personal" appeal that Brownlee was a "living, breathing human being." As the district court found, such a strategy would have benefitted from evidence of Brownlee's background and character.

Because of the unusual circumstances of this case, in which the State does not contest that counsel performed deficiently, the sole question under Strickland is whether Brownlee can prove prejudice as a result of his counsel's deficient performance. As discussed above, a court will find prejudice only if counsel's errors "undermine confidence in the outcome" of the proceeding. Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. Our confidence is undermined if the petitioner can "show that there is a reasonable probability that . . . the result of the proceeding would have been different" if counsel had not committed "unprofessional errors." Id. Significantly, although a petitioner must show that counsel's errors had more than "some conceivable effect on the outcome of the proceeding," Williams v. Taylor, 529 U.S. 362, 394, 120 S. Ct. 1495, 1514, 146 L. Ed. 2d 389 (2000), the Supreme Court has said that a petitioner is not required to show that "counsel's deficient conduct more likely than not altered the outcome in the case," Strickland,

466 U.S. at 693, 104 S. Ct. at 2068; see also Mincey v. Head, 206 F.3d 1106, 1143 (11th Cir. 2000) ("The 'more likely than not' standard would be more demanding than what is required under Strickland."). Rather, as the Supreme Court has held, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." Strickland, 466 U.S. at 696, 104 S. Ct. at 2069.

As long as "the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results," our confidence is undermined. Id. Phrased another way, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Id. at 694, 104 S. Ct. at 2068; see also Brown v. Jones, 255 F.3d 1273, 1278 (11th Cir. 2001) ("A petitioner satisfies the prejudice prong when he shows that trial counsel's deficient performance deprived him of 'a trial whose result is reasonable.'") (quoting Strickland, 466 U.S. at 687, 104 S. Ct. at 2064).

For a Strickland claim involving counsel's failure to present any mitigating evidence in the sentencing phase of a capital case, our confidence in a sentence of death is undermined if the petitioner can show that "but for counsel's

unprofessional errors, there is a reasonable probability that the sentencer would have weighed the balance of aggravating and mitigating factors to find that the circumstances did not warrant the death penalty." Weeks v. Jones, 26 F.3d 1030, 1042 (11th Cir. 1994) (quoting Bush v. Singletary, 988 F.2d 1082, 1090 (11th Cir. 1993)). We have explained that "[t]he appropriate analysis of the prejudice prong of Strickland requires an evaluation of 'the totality of the available mitigation evidence -- both that adduced at trial, and the evidence adduced in the habeas proceedings -- in reweighing it against the evidence in aggravation.'" Bottoson v. Moore, 234 F.3d 526, 534 (11th Cir. 2000) (quoting Taylor, 529 U.S. at 397-98, 120 S. Ct. at 1515). If, after conducting this analysis, we determine that the capital sentencing was "fundamentally unfair" and that the death sentence was therefore "unreliable," our confidence has been undermined and the petitioner is entitled to relief. Strickland, 466 U.S. at 700, 104 S. Ct. at 2071.

Under the facts of this case, we are compelled to conclude that counsel's failure to investigate, obtain, or present any mitigating evidence to the jury, let alone the powerful mitigating evidence of Brownlee's borderline mental retardation, psychiatric disorders, and history of drug and alcohol abuse, undermines our confidence in Brownlee's death sentence. As an initial matter, we note that counsel faced no legal restrictions in presenting a wide range of

61

mitigating evidence. Alabama law defines mitigating evidence generously, giving jurors and judges wide discretion to decide that a given fact constitutes a mitigating factor. The capital sentencing statute lists seven specific mitigating circumstances, see Ala. Code § 13A-5-51, including that the offense "was committed while the defendant was under the influence of extreme mental or emotional disturbance," id. § 13A-5-51(2), and that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired," id. at § 13A-5-51(6). The statute then establishes that, in addition to those factors, "mitigating circumstances shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for life imprisonment without parole instead of death," as well as "any other relevant mitigating circumstance." Id. § 13A-5-52; see also, e.g., Beck v. State, 396 So. 2d 645, 663 (Ala. 1980) (holding that "the court must permit the defendant to introduce any matter relating to any mitigating circumstances"); Haney v. State, 603 So. 2d 368, 389 (Ala. Crim. App. 1991) (discussing defendant's right to "a full and unrestricted opportunity to present mitigating evidence regarding her character, background, motivations, and record and the circumstances of the offense").

Indeed, the broad inclusion of mitigating evidence is mandated not only by

the Alabama statute, but also by the Supreme Court and this Court, which have repeatedly emphasized the constitutional right of a defendant facing the death penalty to present any relevant evidence of mitigating circumstances.  In Lockett v. Ohio, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978), the Supreme Court explained that the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed," and thus held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Id. at 604, 98 S. Ct. at 2964-65.  As we said in Bolender v. Singletary, 16 F.3d 1547, 1562 n. 18 (11th Cir. 1994), Lockett and its progeny "stand for the proposition that a defendant in a capital case has the right to present any relevant and competent mitigating evidence to the sentencer." See generally Dobbs v. Turpin, 142 F.3d 1383, 1386-87 (11th Cir. 1998) ("The purpose of a sentencing hearing is to provide the jury with the information necessary for it to render an individualized sentencing determination based upon the character and record of the individualized offender and the circumstances of the particular offense.") (internal punctuation and citations omitted).

63

If counsel had exercised Brownlee's right to present all relevant and competent mitigating evidence, the jury would have heard compelling evidence addressing two statutory mitigating circumstances -- that the crime "was committed while the defendant was under the influence of extreme mental or emotional disturbance," Ala. Code. § 13A-5-51(2), and that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired," id. § 13A-5-51(6) -- as well as several significant non-statutory mitigating factors, see id. § 13A-5-52.

These factors are amply supported by evidence of Brownlee's borderline mental retardation, serious psychiatric illnesses, and extensive drug abuse, particularly on the night in question. In testimony uncontradicted by the State, Dr. Beidleman explained that Brownlee had an IQ score "in the range of 67, 68, 75." He characterized Brownlee as borderline mentally retarded and said that his "limited intellectual resources" left him "right on the borderline between having severe social and occupational impairment . . . and being able to cope in a sort of mildly adaptive manner, right on the edge." According to Dr. Beidleman, Brownlee's substantial intellectual limitations were compounded by a variety of significant psychiatric disorders, including schizotypal personality disorder, antisocial personality disorder, various drug dependencies, and seizure disorder or

64

epilepsy. As described by Dr. Beidleman, these disorders were real and substantial. Schizotypal personality disorder, for example, is marked by thought disturbance, paranoid ideation, and excessive social anxiety. Moreover, Brownlee's frequent seizures, as described by his sisters and neighbor, included terrifying episodes in which he would lose consciousness, cause significant damage to his surroundings and his own body, and fall to the floor convulsing, with his mouth foaming, his eyes rolling back in his head, and his tongue in danger of being swallowed. One episode even involved Brownlee's effort to jump out the window of a second-story apartment.

At the Rule 32 proceeding, Dr. Beidleman explained that the combination of Brownlee's limited intellectual functioning and psychiatric disorders left him with "diminished capacity." Particularly if Brownlee had been using drugs before going to Jodie's Lounge,[20] Dr. Beidleman testified that Brownlee would have been "significantly impaired" as a result of his various disorders at the time of the crime, and "[h]e would have [had] difficulty guiding his actions and might have [had] difficulty conforming his behavior." Dr. Beidleman discussed Brownlee's impairments in these terms:

---

[20]In addition to Goodgame's testimony that Brownlee had been using drugs before going to Jodie's Lounge, Dr. Beidleman testified in the judicial sentencing hearing that Brownlee reported using cocaine, talwin, and alcohol during the crime.

65

Well, certainly I think you have to first examine his intellectual level, he's operating with very diminished intellectual capacity, if the prison records and my evaluations are accurate, he certainly doesn't function with more than 75 IQ points. Based on that alone, you expect diminished judgment, poor social intelligence. When you add the factors of drug and alcohol abuse and perhaps extreme levels of both, it is hard to tell for sure, but if he was abusing those substances, they would have an accumulative effect on these other disorders.

Dr. Beidleman further explained that, because of his substantial intellectual limitations and psychiatric illnesses, Brownlee differed markedly from other individuals who drank alcohol or used drugs. Addressing counsel, he explained, "if you drank sufficiently to be impaired, you still have the pluses . . . of being highly intelligent, having some social control over your behavior and not having the existence of any present psychiatric disorders, like his personality disorder." Brownlee, on the other hand, lacked any of these "pluses."

Our confidence in the advisory sentencing verdict is undermined because the jury did not hear any of this significant testimony. First, but for counsel's unprofessional errors in failing to present Dr. Beidleman's diagnoses and the supporting evidence to the jury, there is a reasonable probability that the combination of Brownlee's serious psychiatric disorders and his drug use would have supported a finding that the crime was committed "under the influence of extreme mental or emotional disturbance." Ala. Code § 13A-5-51(2). As Dr. Beidleman explained, Brownlee suffered from various disturbances and psychiatric

66

disorders even when he was not abusing drugs, and his disorders included seizures in which he would do harm to himself and engage in other uncontrollable behavior. Once drugs were taken, Brownlee likely experienced an "extreme mental or emotional disturbance" under § 13A-5-51(2). See McNabb v. State, -- So. 2d --, 2002 Westlaw 126987, at *2 (Ala. Crim. App. Feb. 1, 2002) (discussing court's finding of statutory mitigation based on defendant's voluntary cocaine use and resulting "cocaine paranoia").

Also under the Alabama statute, there is a reasonable probability that, but for counsel's unprofessional errors, the jury would have found that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired." Ala. Code § 13A-5-51(6). According to Dr. Beidleman, Brownlee's capacity was diminished by his limited intellectual functioning and psychiatric disorders alone. Drug or alcohol use on the day of the crime would have substantially aggravated these pre-existing limitations. Although the drug use, standing alone, would not have qualified Brownlee for the mitigating circumstance under § 13A-5-51(6), see Ferguson v. State, 814 So. 2d 925, 964 (Ala. Crim. App. 2000), the jury could have found this statutory mitigator if Brownlee's "level of intoxication was so great that his ability to appreciate the criminality of his conduct or to conform his conduct to the law

67

was substantially impaired," id.[21] Further, while substantial evidence showed that Brownlee had a limited ability to control his actions or judge right and wrong as a result of his psychiatric disorders, intellectual impairments, and drug abuse, none of this evidence was presented to the jury due to counsel's deficient performance.

Our confidence is further undermined because, in addition to the statutory mitigating circumstances, there is a reasonable probability that the jury would have found non-statutory mitigating circumstances to exist. Most importantly, we believe that the jury could have found a mitigating circumstance based on Brownlee's borderline intellectual functioning and psychiatric disorders, which, again, included schizotypal personality disorder, antisocial personality disorder, multiple drug dependencies, and a violent seizure disorder or epilepsy. See, e.g., Smith v. State, -- So. 2d --, 2002 WL 126985, at *57 (Ala. Crim. App. Feb. 1, 2002) (listing defendant Willie Smith's "verbal I.Q. of 75, classified as the borderline range between mild retardation and low-average intelligence" as a

---

[21]We recognize that emphasizing a defendant's intoxication at the time of a murder could weaken a case for a life sentence because "a showing of alcohol and drug abuse is a two-edged sword." Robinson v. Moore, -- F.3d --, 2002 Westlaw 1815705, at *24 (11th Cir. Aug. 8, 2002) (quoting Tompkins v. Moore, 193 F.3d 1327, 1338 (11th Cir. 1999)). Nevertheless, we believe in the instant case that Brownlee would have benefitted from the presentation of such evidence because, as Dr. Beidleman testified, Brownlee's drug use and intoxication at the time of the crime exacerbated his pre-existing severe intellectual limitations and psychiatric disorders. On the peculiar facts of this case, the jury would not have been asked to find that the Brownlee's drug use, standing alone, was a mitigating circumstance.

"properly found" mitigating factor); Smith v. State, -- So. 2d --, 2000 WL 1868419 (Ala. Crim. App. Aug. 31, 2001) (listing defendant Jerry Smith's borderline mental retardation as properly found mitigating factor); Clisby v. State, 456 So. 2d 99, 102 (Ala. Crim. App. 1983) (holding that evidence of psychiatric disorders such as antisocial personality "must be considered as relevant mitigating evidence") (emphasis in original).

Evidence of Brownlee's severe intellectual limitations is particularly significant in light of the United States Supreme Court's recent holding in Atkins v. Virginia, -- U.S. --, 122 S. Ct. 2242, -- L. Ed. 2d -- (2002), that the Eighth Amendment categorically prohibits the execution of mentally retarded individuals. As the Supreme Court explained, mental retardation is generally defined as having an IQ below 70, see id. at -- n.5, 122 S. Ct. at 2245, accompanied by "significant limitations in adaptive skills such as communication, self-care, and self-direction that become manifest before age 18," id. at --, 122 S. Ct. at 2250. An individual who is mentally retarded has a "diminished capacit[y] to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." Id. (footnote omitted). In Atkins, the Supreme Court said that even though the deficiencies faced by mentally retarded individuals "do not warrant an

69

exemption from criminal sanctions, . . . they do diminish their personal culpability." Id. at --, 122 S. Ct. at 2250-51. As a result, the Court held that "the mentally retarded should be categorically excluded from execution" because they are less deserving of society's ultimate retribution and less susceptible to the deterrent effects of the death penalty. Id. at --, 122 S. Ct. at 2251. The Court also noted that, for a variety of reasons, "[m]entally retarded defendants in the aggregate face a special risk of wrongful execution." Id. at --, 122 S. Ct. at 2252. Thus, under Atkins, a mentally retarded individual cannot be executed even if a jury has found multiple aggravating circumstances to exist.

In this case, Brownlee's trial lawyers had their client examined by only one clinical psychologist. This examination took place only after the trial judge suggested that counsel contact Dr. Beidleman, and, notably, only after the jury phase of the sentencing process was completed. Based on Dr. Beidleman's testimony alone, which included evidence that Brownlee's IQ was "in the range of 67, 68, 75," there is a reasonable probability that the jury would have found that Brownlee suffered from mild or borderline mental retardation, or that a non-statutory mitigating circumstance existed. Indeed, it is abundantly clear that an individual "right on the edge" of mental retardation suffers some of the same limitations of reasoning, understanding, and impulse control as those described by

70

the Supreme Court in <u>Atkins</u>. Counsel's failure to investigate this issue at all or to present any of this evidence seriously undermines our confidence in the application of the death sentence.

We cannot say with certainty what the jury would have done if they had heard the substantial mitigating evidence in this case. What we can say is that our confidence in the jury's balancing of the aggravating and mitigating circumstances, and its resulting recommendation of death, has been substantially undermined as a result of counsel's failure to present to the jury any of the powerful mitigating evidence that was available. Our concerns are exacerbated in light of lingering questions about the strength of the case against Brownlee, including whether or not he fired the fatal shot killing Dodd, which hinged entirely on the testimony of Goodgame. Unlike Goodgame, Brownlee was not identified by any of the witnesses as being in the bar during the robbery, and no forensic evidence linked him to the crime. Moreover, nobody, not even Goodgame, claimed to have seen Brownlee shoot Dodd. In addition, much of Goodgame's testimony was contradicted by Warren and Jones, and all three witnesses who implicated Brownlee in the crime admitted to using drugs, including cocaine and "T's and blues," extensively on the night in question. Although there was sufficient evidence to convict Brownlee beyond a reasonable doubt, in light of the many

71

evidential weaknesses linking Brownlee to the murder (including the absence of any eyewitness identification or scientific evidence and the many material inconsistencies in the accounts of Goodgame, Warren, and Jones), the substantial mitigating evidence never presented to the jury looms still larger in the calculus.

As we have observed before, "[t]he primary purpose of the penalty phase is to insure that the sentence is individualized by focusing [on] the particularized characteristics of the defendant. By failing to provide such evidence to the jury, though readily available, trial counsel's deficient performance prejudice[s a petitioner's] ability to receive an individualized sentence." Cunningham v. Zant, 928 F.2d 1006, 1019 (11th Cir. 1991) (citations omitted). In this case, counsel's absolute failure to investigate, obtain, or present any evidence, let alone the powerful, concrete, and specific mitigating evidence that was available, prevented the jurors from hearing anything at all about the defendant before them. An individualized sentence, as required by the law, was therefore impossible. Instead, the jury was asked to decide Virgil Brownlee's fate without hearing anything about his borderline mental retardation, his schizotypal personality disorder, his antisocial personality disorder, his many drug and alcohol dependencies, or his history of seizures.

As in Collier v. Turpin, 177 F.3d 1184 (11th Cir. 1999), another case in

72

which counsel's failure to present adequate mitigating evidence to the jury was deemed prejudicial, we believe that counsel's ineffectiveness in fact

> precipitated a 'breakdown in the adversarial process.' The jury was called upon to determine whether a man whom they did not know would live or die; they were not presented with the particularized circumstances of his past and of his actions on the day of the crime that would have allowed them fairly to balance the seriousness of his transgressions with the conditions of his life. Had they been able to do so, we believe that it is at least reasonably probable that the jury would have returned a sentence other than death.

Id. at 1204. Quite simply, our confidence is undermined because there is a reasonable probability that the jury would have recommended a life sentence if it had heard all of the powerful mitigating evidence that could have been presented. The result of Brownlee's sentencing proceeding is "unreliable," and, on this incomplete record, the imposition of a death sentence is "fundamentally unfair." Strickland, 466 U.S. at 700, 104 S. Ct. at 2071. This finding of prejudice, coupled with the uncontested finding of deficient performance, establishes Brownlee's Sixth Amendment claim of ineffective assistance of counsel at sentencing.

## B.

The State also argues that any perceived prejudice in failing to present this body of mitigating evidence to the jury was altogether cured because the trial judge heard much of this evidence at the sentencing phase and still decided that there were no mitigating circumstances. We disagree and hold that, in this case, the

73

constitutional flaw evident at the jury sentencing phase was not cured by the trial judge.

Our precedent has long indicated that the role of the advisory jury is so essential that a failure to present mitigating evidence to the jury cannot easily be cured at the judicial sentencing stage. In Magill v. Dugger, 824 F.2d 879 (11th Cir. 1987), we considered an appeal from a Florida death sentence imposed after the trial court instructed the sentencing jury that it could not consider evidence of the defendant's remorse as a nonstatutory mitigating factor. This instruction violated the Supreme Court's mandate in Lockett that a defendant must be allowed to present any aspect of his character or record, or any circumstances of the crime, that he deems appropriate as mitigating evidence. See Lockett, 438 U.S. at 604, 98 S. Ct. at 1965. The jury then recommended a sentence of death based on the evidence that it did consider, and the trial court imposed a death sentence. The Florida Supreme Court vacated the death sentence on grounds unrelated to Lockett, and on remand the trial judge, without a new advisory jury, again sentenced the defendant to death.

On habeas corpus review, we held the death sentence unconstitutional because, due to the Lockett error, the defendant never had the benefit of a constitutionally proper jury sentencing. We explained that "to hold that

74

resentencing by the court cleanses the taint of the original proceeding would ignore the importance of the advisory jury in the Florida sentencing scheme." <u>Magill</u>, 824 F.2d at 894. Under the Florida sentencing scheme, the judge would have had to follow the jury's recommendation unless the facts underlying the death sentence "were so clear and convincing that virtually no reasonable person could differ as to the appropriateness of the death penalty." <u>Id</u>.

Based on the role of the jury in Florida capital sentencing, we explained in <u>Magill</u> that "[w]e cannot hold that the subsequent resentencing by the court purged the taint of the original proceedings without infusing an unacceptable level of arbitrariness into the administration of the death penalty in Florida." <u>Id</u>. Rather, we held that "[t]he error can be cured only by a sentencing proceeding before a new advisory jury." <u>Id</u>. Although the law in place at the time of <u>Magill</u> allowed a state to "allocate the sentencing power as it wishe[d] between the judge and jury," <u>id</u>. (citation omitted),[22] we rejected the idea that "a state may arbitrarily alter this allocation as it applies to particular defendants," <u>id</u>. Because Florida law called for advisory jury proceedings, we noted that "[a] capital defendant is no less entitled to that advisory jury sentence merely because his original sentencing proceeding was

---

[22]This principle has been altered by the Supreme Court's recent holding in <u>Ring v. Arizona</u>, -- U.S. --, 122 S. Ct. 2428, -- L. Ed. 2d -- (2002), that a defendant cannot be sentenced to death on the basis of an aggravating circumstance found by a sentencing judge sitting without a jury.

infected by constitutional error." Id.

We reached a virtually identical conclusion in Jones v. Dugger, 867 F.2d 1277 (11th Cir. 1989), another Florida case. In Jones, we held that a judge's erroneous instruction to the sentencing jury that it could consider only statutory mitigating factors was not rendered harmless even though the judge in fact later considered evidence of the nonstatutory mitigating factors, which consisted of testimony that the petitioner was loved by his family and behaved well in prison. See id. at 1280. The decision in Jones rested on the conclusion that the judge's error-free consideration of the mitigating evidence did not constitute a "curative action" in light of "the importance of the advisory jury in the Florida sentencing scheme." Id. Indeed, as a panel of this court explained, "because the jury recommendation resulted from an unconstitutional procedure, the entire sentencing process has necessarily been tainted. The trial judge's consideration of nonstatutory mitigating evidence, therefore, did not render harmless the Lockett error." Id. (footnote omitted).

As Alabama's own law and cases from the United States Supreme Court clearly show, the similarities between the Florida and Alabama capital sentencing systems make the reasoning of Magill and Jones entirely applicable to this case.

The role of the sentencing jury is essential in Alabama as it is in Florida

76

even though the Florida capital sentencing statute requires the judge to afford "great weight" to the jury's recommendation and allows him to override a life sentence only if "virtually no reasonable person" could disagree with a sentence of death, Tedder v. State, 322 So. 2d 908, 910 (Fla. 1975), while in Alabama the trial court is required only to "consider" the jury recommendation.  Alabama's capital sentencing statute establishes unambiguously that the judge "shall consider the recommendation contained in the advisory verdict." Ala. Code § 13A-5-47(e) (emphasis added).  While the statute does not specify the precise weight that a trial judge must afford the jury's recommendation, see, e.g., Ex parte Taylor, 808 So. 2d 1215, 1217-18 (Ala. 2001), the  use of the term "shall consider" indicates that a court is required to reflect actively and carefully on the jury's recommendation, as consideration clearly involves more than a passing thought, see, e.g., Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 608, 118 S. Ct. 2168, 2189, 141 L. Ed. 2d 500 (1998) (Souter, J., dissenting) (describing "taking into consideration" as a "conscious activity," involving "continuous and careful thought; examination; deliberation; attention") (quotations and citations omitted); see also Black's Law Dictionary 277 (5th ed. 1979) (defining "consider" as "[t]o fix the mind on, with a view to careful examination; to examine; to inspect.  To deliberate about and ponder over.  To entertain or give heed to."); Webster's Third

77

New Int'l Dictionary, 483 (1986) (listing, as first definition, "to reflect on: think

about with a degree of care or caution").

Indeed, like the Florida Supreme Court, whose descriptions of the

importance of the jury's role played an important part in our decisions in Magill

and Jones, the Alabama Supreme Court has itself explained that a trial judge in

Alabama must take into account a recommendation from the sentencing jury under

the state's capital sentencing scheme. In Ex parte Williams, 556 So. 2d 744 (Ala.

1987), the court held that a sentencing jury's consideration of an improper

aggravating factor was not cured by the trial judge's removal of that improper

factor from his equation when he decided whether to accept the jury's

recommendation of death.[23] As the court explained in Williams, Alabama's capital

sentencing statute gives the jury an essential role in the sentencing process that is,

in fact, as important as the role of the judge:

> The legislatively mandated role of the jury in returning an advisory
> verdict, based upon its consideration of aggravating and mitigating
> circumstances, can not be abrogated by the trial court's errorless
> exercise of its equally mandated role as the ultimate sentencing
> authority. Each part of the sentencing process is equally mandated by
> the statute; and the errorless application by the court of its part does
> not cure the erroneous application by the jury of its part. . . . To hold

---

[23]The jury in Williams was instructed that it could consider, as an aggravating circumstance, the fact that the defendant was under a sentence of imprisonment when he committed the capital offense. Before the judicial sentencing hearing, however, it was established that the defendant had in fact not been under such a sentence.

78

>otherwise is to hold that the sentencing role of the jury, as required by statute, counts for nothing so long as the court's exercise of its role is without error.

Id. at 745 (citing Ala. Code §§ 13A-5-46, 47(e)).  As the Alabama statute and the discussion in Williams make clear, Alabama has developed a capital sentencing scheme in which the role of the sentencing jury is no less important than in Florida.

The United States Supreme Court recognized this principal in Harris v. Alabama, 513 U.S. 504, 514-15, 115 S. Ct. 1031, 1036-37, 130 L. Ed. 2d 1004 (1995), when it  held that Alabama's capital sentencing system is consonant with the Eighth Amendment even though it does not specify the precise weight that a judge must give to the jury's verdict.  Discussing the central role of the advisory jury in Alabama, the Court explained that an Alabama death sentence must be reversed if there has been a constitutional error in the jury phase: "If the judge must consider the jury verdict in sentencing a capital defendant, as the statute plainly requires, then it follows that a sentence is invalid if the recommendation upon which it partially rests was rendered erroneously." Harris, 513 U.S. at 512, 115 S. Ct. at 1036.

In explaining why the role of the jury is essential under Alabama's capital sentencing system, the Supreme Court discussed the principle announced earlier in Espinosa v. Florida, 505 U.S. 1079, 112 S. Ct. 2926, 120 L. Ed. 2d 854 (1992), that

the presentation of an improper aggravating factor to the sentencing jury renders a death sentence invalid even if the trial judge did not consider that improper aggravating factor in reaching the final sentence.[24]  The Harris Court explained that such an error before the sentencing jury would not be harmless in Alabama just because a judge there, unlike a judge in Florida, is not required to give any particular weight to the jury's verdict.  Instead, the Supreme Court observed that "consequential error attaches whenever the jury recommendation is considered in the process, not only when it is given great weight by the judge." Harris, 513 U.S. at 513, 115 S. Ct. at 1036.  This is so because "the indirect weighing of an invalid aggravating factor creates the same potential for arbitrariness as the direct weighing of an invalid aggravating factor." (citing Espinosa, 505 U.S. at 1082, 112

---

[24]In Espinosa, the jury was given an unconstitutionally vague instruction describing the aggravating circumstance for an "especially wicked, evil, atrocious or cruel" murder.  The State argued that even though the instruction allowed the jury to consider an improper aggravating factor, any error was cured because the trial judge, acted independently, weighed the aggravating and mitigating circumstances properly.  The United States Supreme Court rejected this argument, holding that "if a weighing State decides to place capital sentencing authority in two actors rather than one, neither actor must be permitted to weigh invalid aggravating circumstances." 505 U.S. at 1082, 112 S. Ct. at 2929.

In Fortenberry v. Haley, -- F.3d --, 2002 Westlaw 1574989, at *10 n.7 (11th Cir. July 17, 2002), we recently held that the petitioner's Espinosa claim provided no basis for habeas corpus relief because his conviction became final before the Supreme Court issued Espinosa, a decision the Supreme Court has deemed not retroactive. See id. at --.  Because our decision does not rely on Espinosa, Brownlee does not face a similar retroactivity problem.  Our decision rests on the reasoning of Strickland, Magill and Jones, all of which were issued before Brownlee's conviction became final.

80

S. Ct. at 2928.

As Harris makes clear, the rationale behind Magill and Jones applies with equal force in Alabama as in Florida. It is evident that, as discussed above, a prejudicial error in the jury phase of a bifurcated sentencing proceeding, such as the Sixth Amendment violation in this case, prevents the jury from issuing a valid advisory verdict. Without such a verdict, the trial judge is unable to perform his statutorily-mandated task of considering the jury's opinion and building upon that opinion to fashion an appropriate sentence for the defendant. As a result, a prejudicial error in the jury phase, such as a violation of the Sixth Amendment's right to counsel, taints the entire sentencing proceeding. Allowing a judge to cure this taint in the case of an individual defendant could limit the significance of the jury participation required by statute and would risk, as we explained in Magill, "infus[ing] an unacceptable level of arbitrariness into the administration of the death penalty." 824 F.2d at 894. This is equally true in Alabama as it is in Florida. Because the Alabama legislature has given the jury an essential role in the sentencing process, that role cannot readily be abrogated.

The particular importance of the jury's role in the application of the death sentence has been re-emphasized by the Supreme Court's recent decision in Ring, which held the Sixth Amendment does not allow "a sentencing judge, sitting

81

without a jury, to find . . . aggravating circumstance[s] necessary for imposition of the death penalty," and instead "requires that they be found by a jury." -- U.S. at --, 122 S. Ct. at 2443. As the Court explained, the constitutional right to a jury trial guarantees that if a defendant facing the death penalty "prefer[s] the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he [is] to have it." Id. (quoting Duncan v. Louisiana, 391 U.S. 145, 156, 88 S. Ct. 1444, 1451, 20 L. Ed. 2d 491 (1968)). Based on this principle, Ring expressly invalidated the capital sentencing laws of Arizona and four other states that "commit both capital sentencing factfinding and the ultimate sentencing decision entirely to judges," id. at -- n.6, 122 S. Ct. at 2442, but the Supreme Court did not address the constitutionality of the Alabama and Florida systems, "in which the jury renders an advisory verdict but the judge makes the ultimate sentencing determinations." Id. In this appeal, we have no need to address the many complicated issues raised by Ring because Brownlee's sentence was improperly rendered under longstanding principles articulated in Strickland and in Magill and Jones.[25] Plainly, however, Ring reinforces our earlier holdings regarding the

---

[25]It is apparent that the jury in this case did find at least one aggravating circumstance to exist beyond a reasonable doubt. In finding Brownlee guilty of murdering Dodd during the robbery of Jodie's Lounge, the jury necessarily found that "[t]he capital offense was committed while the defendant was engaged or was an accomplice in the commission of . . . robbery,"an aggravator under Ala. Code § 13A-5-49(4).

82

central role of the jury in the capital sentencing process.

Quite simply, precedent from the Supreme Court and this Circuit makes clear that, in light of the central role that Alabama has assigned to the capital sentencing jury, a judge must be able to consider a constitutionally valid jury recommendation of life or death when sentencing a capital defendant. In this case, no such recommendation was available to the judge because the jury did not hear any of the powerful mitigating evidence that should have been presented.[26] The role of the jury is too important, and the right to introduce all mitigating evidence is too essential, to permit a judge to correct so egregious a failure by counsel to investigate, obtain, or present powerful mitigating evidence to the sentencing jury.

Additionally, just as we find no basis to distinguish Magill and Jones based on the fact that this case involves the law of Alabama, rather than Florida, we also can find no basis to distinguish them because the constitutional violation in the jury

---

[26]We also note that, even in the judicial sentencing proceeding, the trial court did not hear all of the mitigating evidence that counsel could have presented. Indeed, significant portions of Brownlee's mitigating evidence were not presented until the Rule 32 proceedings. For example, based on his three meetings with Brownlee and his review of records that had not been made available before the judicial sentencing, Dr. Beidleman testified in detail at the Rule 32 hearing about Brownlee's intellectual limitations and the effects that those limitations had on the day of the crime. In fact, it was not until the Rule 32 proceeding that the trial court heard that Brownlee's IQ was "in the range of 67, 68, 75 IQ points." It was also adduced from Dr. Beidleman that Brownlee's IQ was tested while he was in prison and that it had tested at 69. The Rule 32 proceedings also included far more information about Brownlee's seizure disorder based on Dr. Beidleman's review of previously-unpresented records as well as the detailed testimony of Brownlee's sisters and neighbor, Maxine Driver.

sentencing phase of Brownlee's case involved the Sixth Amendment, not the

Eighth Amendment. Although we have never had occasion to apply Magill and

Jones to a case in which the jury's failure to consider mitigating evidence resulted

from ineffective assistance of counsel as opposed to an erroneous jury instruction,

it is clear that the principle announced in those cases should apply here. We can

find no logical, legal, or historical reason to hold otherwise. Indeed, the Sixth

Amendment's right to counsel is a "fundamental" right that is, at the very least,

every bit as critical as the Eighth Amendment's right to present mitigating

evidence to the jury. See Strickland, 466 U.S. at 684-85, 104 S. Ct. at 2063 ("[T]he

Sixth Amendment right to counsel . . . is needed[] in order to protect the

fundamental right to a fair trial. . . . The right to counsel plays a crucial role in the

adversarial system embodied in the Sixth Amendment, since access to counsel's

skill and knowledge is necessary to accord defendants the ample opportunity to

meet the case of the prosecution.") (quotations omitted). As a result of the

constitutional error, Brownlee's jury -- like the juries in Magill and Jones -- did not

have any opportunity to hear or evaluate powerful mitigating evidence.[27] The

---

[27]The evidence in mitigation in this case is far more powerful than the evidence that was not considered by the jury in Magill or Jones. The unconsidered mitigating evidence in Magill consisted solely of the defendant's expressions of remorse, while the evidence not considered in Jones consisted of character testimony from the defendant's sister and a prison guard.

84

advisory verdict was therefore unconstitutionally flawed and there was no constitutionally reliable jury recommendation for the sentencing court to consider.

In short, because Brownlee plainly received ineffective assistance of counsel that prevented the sentencing jury from considering powerful mitigating evidence and necessarily prevented the trial judge from "considering" any constitutionally valid jury recommendation, the death sentence cannot stand. The constitutional error in this case can be cured only by a sentencing proceeding before a new jury. See Magill, 824 F.2d at 894.[28]

IV.

For the foregoing reasons, we AFFIRM the district court's denial of Brownlee's petition for a writ of habeas corpus with respect to his conviction, REVERSE the ruling of the district court denying Brownlee's petition as to his sentence of death, and REMAND this case with the instruction that the district court grant the writ of habeas corpus vacating Brownlee's sentence of death.

AFFIRMED, in part, REVERSED, in part, and REMANDED with instructions.

---

[28]In light of our holding that Brownlee is entitled to a new sentencing proceeding, we need not address his other allegations of sentencing error.

EDMONDSON, Chief Judge, concurring in the judgment:

I concur in the judgment. I stress that the State, in the appeal, did not contest the district court's determination that trial counsel performed deficiently at sentencing. So, the first element (the performance element) of Strickland was never put into controversy in this appeal. I also stress that I doubt -- and do not understand today's opinion to say -- that the failure to introduce evidence of mild or borderline mental retardation in a capital sentencing proceeding will be, or almost always will be, or even usually will be enough to satisfy the prejudice element of Strickland. We need to be cautious about applying what is said in the context of Eighth Amendment opinions in the materially different context of deciding ineffective-assistance-of-counsel cases.