NOT DESIGNATED FOR PUBLICATION

No. 127,566

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ROGER LEE NICHOLS,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee.*

MEMORANDUM OPINION

Appeal from Leavenworth District Court; MICHAEL D. GIBBENS and CLINTON LEE, judges. Oral argument held November 18, 2025. Opinion filed February 6, 2026. Affirmed.

*Joseph A. Desch*, of Law Office of Joseph A. Desch, of Topeka, for appellant.

*Natalie Chalmers*, principal assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before ARNOLD-BURGER, P.J., MALONE and BOLTON FLEMING, JJ.

PER CURIAM: This appeal follows an evidentiary hearing on a K.S.A. 60-1507 motion where Roger Lee Nichols challenged the effectiveness of his prior K.S.A. 60-1507 counsel. Following that hearing, the district court found that Nichols was not entitled to relief and denied the motion. Because we find the district court's findings of fact are supported by substantial competent evidence and are sufficient to support the court's conclusions of law, we affirm.

1

Nichols was convicted by a jury of aggravated criminal sodomy and two counts of aggravated indecent liberties with a child. Nichols appealed and this court affirmed his convictions. *State v. Nichols*, No. 106,974, 2012 WL 6217199, at *9 (Kan. App. 2012) (unpublished opinion) (*Nichols I*). The facts of the underlying criminal case and its direct appeal are well set out in *Nichols I*. The evidence centered on the testimony of the two young girls who were the victims in the case. Testimony was received from the forensic interviewer, the girls' mother, friends of the girls to whom they had told of the abuse, and law enforcement. Nichols also testified expressing a complete denial of the allegations and put on several fact witnesses that testified the girls had recanted their claims and indicated they were lying.

After his conviction, Nichols filed a motion under K.S.A. 60-1507 asserting that his trial attorney, Deb Snider, was ineffective. He retained Adam Hall to represent him. The court denied the motion after a full evidentiary hearing, and that denial was affirmed on appeal. See *Nichols v. State*, No. 116,116, 2017 WL 3327085 (Kan. App. 2017) (unpublished opinion) (*Nichols II*). Nichols subsequently filed a second K.S.A. 60-1507 motion again contending his trial counsel was ineffective but also alleging ineffective assistance of counsel by Hall in the proceedings on the first K.S.A. 60-1507 motion. The district court summarily dismissed this second motion as successive. However, on appeal this court found the claims regarding Hall were not successive and remanded for a hearing on those issues. *State v. Nichols*, No. 123,043, 2021 WL 5445354 (Kan. App. 2021) (unpublished opinion) (*Nichols III*). On remand, after an evidentiary hearing, the district court again denied the motion, finding Hall was not ineffective. It is that holding that is appealed here.

The facts of the first postconviction motion (claiming Snider's ineffectiveness) are set out in *Nichols II*. We will refer to additional facts relating to both this K.S.A. 60-1507

2

motion (claiming Hall's ineffectiveness) and the previous motion alleging the ineffectiveness of Snider, as necessary. The two are inescapably intertwined.

ANALYSIS

*Our Standard of Review*

To establish ineffective assistance of counsel, defendants must comply with the two-prong ineffective assistance of counsel test controlled by *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014). Under the first prong, defendants must establish that their counsel's representation was deficient when viewed under the totality of the circumstances. 300 Kan. at 882 (relying on *Strickland*, 466 U.S. at 687). Under the second prong, defendants must establish "prejudice, *i.e.*, that there is a reasonable probability the jury would have reached a different result absent the deficient performance." *Sola-Morales*, 300 Kan. at 882. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011). Both the performance and prejudice prongs of the test are reviewed de novo as mixed questions of law and fact. *Flynn v. State*, 281 Kan. 1154, 1157, 136 P.3d 909 (2006).

When considering counsel's performance, there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). Accordingly, a court's review of counsel's conduct is highly deferential. *State v. Cheatham*, 296 Kan. 417, 431, 292 P.3d 318 (2013) (citing *Strickland*, 466 U.S. at 690-91). Moreover, if the decision the defendant complains about was actually a strategic decision made by counsel following a thorough investigation of the law and facts of the defendant's case, then counsel's strategic decision is virtually unchallengeable. *Cheatham*, 296 Kan. at 437 (citing

3

*Strickland*, 466 U.S. at 690-91). There is a strong presumption that counsel took certain actions for tactical reasons rather than through sheer neglect. *Cullen v. Pinholster*, 563 U.S. 170, 191, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011).

"Yet it is inappropriate to argue that counsel's alleged strategic decisions are insulated from review when counsel lacks the information necessary to make an informed decision due to an insufficient investigation." *State v. Butler*, 307 Kan. 831, 854, 416 P.3d 116 (2018). Nichols bears the burden of demonstrating that trial counsel's alleged deficiencies were not the result of strategy. See *Sola-Morales*, 300 Kan. at 888.

After a full evidentiary hearing on a K.S.A. 60-1507 motion, the district court must issue findings of fact and conclusions of law concerning all issues presented. Supreme Court Rule 183(j) (2025 Kan. S. Ct. R. at 238). This court reviews the district court's findings of fact to determine whether they are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. *State v. Peters*, 319 Kan. 492, 499, 555 P.3d 1134 (2024). "'Substantial competent evidence is legal and relevant evidence a reasonable person could accept to support a conclusion.'" *State v. Butler*, 307 Kan. 831, 853, 416 P.3d 116 (2018). Appellate review of the district court's ultimate conclusions of law is de novo. *Peters*, 319 Kan. at 499.

*The two issues on appeal*

Nichols appealed the decision in *Nichols II*. The Kansas Supreme Court denied Nichols' petition for review, and the mandate was issued. In this case, while Nichols again contended that his trial counsel was ineffective, he also contended that the attorney, Adam Hall, his first K.S.A. 60-1507 counsel, provided ineffective assistance in those proceedings. See *Nichols III*, 2021 WL 5445354, at *2. The district court summarily dismissed Nichols' second K.S.A. 60-1507 motion as successive, finding that Nichols had failed to establish exceptional circumstances excusing the procedural bar to successive

4

motions under K.S.A. 2018 Supp. 60-1507(c) which would justify the court considering his claims on the merits. *Nichols III*, 2021 WL 5445354, at *3.

In *Nichols III*, a panel of this court noted the following claims related to the ineffectiveness of Nichols' K.S.A. 60-1507 counsel (Hall).

- Before trial, defense counsel [Snider] obtained records from a psychologist and a private detective that showed deficiencies in the forensic interview by Helen Swan. Defense counsel should have retained an expert to testify and impeach Swan with this information. Nichols' original 60-1507 counsel [Hall] had the same records "'and he in turn did nothing with them. Including securing and hiring an expert witness to establish the ineffective assistance of counsel Mr. Nichols received from'" [trial counsel].

- At the evidentiary hearing on Nichols' motion, Hall should have called various witnesses, whom Nichols claims lied at trial, to testify so that counsel could confront them with their perjured trial testimony. *Nichols III*, 2021 WL 5445354, at *2-3.

The *Nichols III* panel found that these claims against Hall were not successive because they involved K.S.A. 60-1507 counsel, not trial counsel. The case was remanded for the district court to consider these two issues. *Nichols III*, 2021 WL 5445354, at *4-5. The district court followed the mandate from this court and decided to conduct a full evidentiary hearing on those two issues. Likewise this appeal is only related to the two issues raised by Nichols in *Nichols III*. So we turn to the merits of Nichols' claim of ineffective representation by Hall, the absence of which, Nichols claims, would have changed the outcome of his case.

1.  *Hall's Failure to Retain an Expert Witness*

Before the trial in this case, Snider consulted with two expert witnesses. Dr. Kathie Nichols, Ph.D., a licensed psychologist, ("Kathie" to eliminate any confusion with Nichols, the movant,) and Don Ballard, a private detective with EAB Investigations (Ballard). These witnesses were specifically hired to review the forensic interview conducted of the two victims and to assail the Finding Words method that was used. Nichols argues that the failure to call these witnesses at the original trial was an error by Snider. In turn, Nichols argues that Hall was ineffective for not calling those same witnesses during the evidentiary hearing. He argues their testimony that the Finding Words protocol is not effective, and even if it was the forensic examiner failed to follow it, would have proven Snider's ineffectiveness, and changed the outcome in his case. Nichols does not claim that Hall had a duty to find other experts to support his theory of the inadequacy of the forensic interviewer. His sole argument is that Hall should have called Kathie and Ballard.

But we pause to note that the foundational case upon which Nichols relies is *Mullins v. State*, 30 Kan. App. 2d 711, 46 P.3d 1222 (2002). He argued that *Mullins* suggested that "a failure to hire an expert and/or cross examine the state's forensic child interviewer was [ineffective assistance of counsel]." Yet the *Mullins* court did not find that failure to retain an expert, or consulting an expert and then failing to have them testify, was per se ineffective assistance; and several subsequent opinions from this court have reiterated this, albeit unpublished. See, e.g., *Randolph v. State*, No. 116,765, 2017 WL 6072956, at *5 (2017) ("*Mullins* does not establish a bright-line rule that *all* instances of a counsel's failure to secure and utilize an expert on child-witness interview techniques equates to deficient representation.").

Instead, as noted by the district court here, the *Mullins* court references counsel's duty to "'consult'" or "'procure'" an expert. Moreover, the purpose of hiring an expert can

be either for "'use at trial or for use in preparation of cross-examination of the State's witnesses.'" 30 Kan. App. 2d 717. There is no duty to call an expert witness to *testify*.

Returning to the legal posture of this case, Hall did not raise this as an issue at all in *Nichols II*, 2017 WL 3327085, at *5. So here it is, in essence, a new basis to relitigate Snider's ineffectiveness. Copies of correspondence between Snider, Kathie, and Ballard are in the record as an attachment to Nichols' pro se legal arguments in support of this second K.S.A. 60-1507 motion. Hall testified that the summary of Kathie's report reflected that there were "problems with the interview." Apparently, a letter from Ballard was also admitted into evidence, but its contents were not discussed in the hearing. The only evidence was that Kathie discussed "the interview techniques that were used." In his appellate brief, Nichols notes that Ballard's letter suggested that he had an unfavorable attitude toward the forensic interviewer personally, essentially believing that she had become a pawn of the prosecution. Ballard also specified that he was providing the letter only as a consultant and did not want the letter released in discovery. In other words, he did not agree to testify and was serving only as a consultant. Even so, the court ruled that neither Kathie's nor Ballard's letter was admitted for the truth of the matter asserted, but merely to show that Hall had seen the letters.

Hall made a strategic decision not to call Kathie or Ballard at the first K.S.A. 60-1507 hearing. "[A]n attorney's strategic decisions are only unchallengeable in habeas cases if counsel made an informed decision based on a thorough investigation of the facts and law applicable to the case." *Wilson v. State*, 51 Kan. App. 2d 1, 18, 340 P.3d 1213 (2014).

With regards to his investigation, Hall testified that after he reviewed the expert letters, he tried to contact Kathie, but spoke to her husband, a local attorney, instead. Her husband advised Hall that

7

"[Kathie] had taken a number of cases of this type, that when she thought the evidence was susceptible to challenge that she would be willing to testify, and when she thought that the evidence was not susceptible to a meaningful challenge, then she would just write—or help write cross-examination questions."

The conclusion from those comments would be that Kathie does not agree to testify if, after reviewing the forensic interview, she does not believe the interview techniques were challengeable. This would be a reason not to call her as a witness.

That said, we do not condone an attorney using the word of an expert's spouse as reliable evidence of that expert's "typical practices." He should have sought clarification from Kathie herself. But Nichols does not dispute that this was Kathie's practice and that Snider used the information she received from Kathie to determine the questions to ask on cross-examination. He merely argues that Hall's reliance on Kathie's spouse as to why she would generally not testify in a case, was not good "professional judgment." We don't disagree.

But the competence of an attorney "must be gauged by the totality" of the circumstances surrounding the defense, and not by "fragmentary segments thereof in isolation." *Turner v. State*, 208 Kan. 865, 867-68, 494 P.2d 1130 (1972); see also *Bland v. Hardy,* 672 F.3d 445, 450 (7th Cir. 2012) ("[T]he question under *Strickland* is not whether the lawyer made a mistake, even a serious one; it is whether the lawyer's *overall* performance was professionally competent.").

At the same time, although Hall seemed not to remember this, Kathie's husband's statement was consistent with Snider's testimony at the hearing on the first K.S.A. 60-1507 motion—testimony that was provided by Snider in response to Hall's questions. She testified that Kathie was one of the foremost experts in the state regarding debunking forensic interviews, specifically those that used the Finding Words protocol. But after

8

talking to her, Kathie advised Snider that she would not be able to help her in the case and she would not be able to come to court on it. It was only then that Snider contacted Ballard. Ballard also told Snider that he would not agree to testify and was serving only as a consultant. The review of the correspondence from Kathie and Ballard confirm Snider's statements.

At the hearing on the second K.S.A. 60-1507 motion, Hall stated that he realized that Snider had consulted with two experts on the forensic protocol before deciding to rely on cross-examining the State's witnesses. Hall opined that although he might have chosen differently, he viewed Snider's decision as a reasonable trial strategy. At the same time, as a strategic decision, he also believed that the forensic expert was not a strong postconviction issue. The following exchange further illustrates Hall's explanation:

"[State:] If there were witnesses that he requested and you thought they were useful, would you have called them?

"[Hall:] Maybe. So I—here's what I recall is the issue was credibility, as indicated by Mr. Floyd. My strategy to challenge the credibility of those witnesses was to use prior inconsistent statements instead of motivation from their mother or issues that the other witnesses sort of raised: Well, you know, she made threats; that there were—she knew people at the courthouse—or Mom knew people at the courthouse, I recall that.

"And I recall the facts that Mr. Floyd raised, but those seemed to pale in comparison to the fact that these girls, the sort of complaining witnesses in the case, the victims in the case, told DCF workers during the time period it was alleged that this sort of series of molestation events took place that they had not been bad touched by Mr. Nichols. That was the evidence that I thought was persuasive and the other matters paled in comparison.

"[State:] So you went with the strategy that you thought was most effective?

"[Hall:] I can say that with certainty."

9

In sum, Hall testified that he accepted the explanation by Kathie's spouse because Snider consulted with two expert witnesses and she made a reasonable decision to just cross-examine the state's witnesses, including the forensic interviewer. Hall's testimony explained his rationale as a strategic process. Because Nichols identified the victims' credibility as the main issue at trial, Hall focused on their prior inconsistent statements—particularly their denials of abuse to Kansas Department for Children and Family (DCF) workers—which he found more persuasive than other impeachment points.

In the journal entry dismissing the second K.S.A. 60-1507 motion, the district court reviewed the experts' letters to Snider stating their opinions. The judge described their contents and took them into account when rendering his decision:

> "Kathie drafted a letter to Snider that did three things: It provided basic information about the Finding Words methodology; it detailed shortcomings she observed with the way that Swan conducted the forensic interviews of the victims; and it notified Snider that Kathie was willing to help Snider prepare her cross-examination, but she was not willing to testify.
>
> "Ballard also provided Snider with a letter explaining the Finding Words protocol and pointing out various perceived weaknesses in the protocol. And, based on his prior familiarity with Swan, Ballard offered his thoughts concerning Swan's background and perceived biases.
>
> "During the criminal trial, however, Snider did not call Kathie or Ballard as a witness for the defense. Rather, Snider engaged in a lengthy cross-examination of Swan during which it appears that Snider utilized much of the information she received from Kathie and Ballard. Snider was successful in getting Swan to concede many points that had the potential effect of undermining the reliability of the Finding Words protocol in the jurors' eyes. For example, Snider elicited the following evidence from Swan:
>
> > • Swan was not a psychiatrist or psychologist.
> > • Finding Words protocol is not peer reviewed.
> > • Finding Words training consists of a mere 40 hours.

- A Finding Words trainee need not even read the written materials to pass the final exam.
- Finding Words is just one of many interview protocols and they all differ from one another.
- Finding Words does not require the interviewer to first demonstrate that a child understands the difference between truth and a lie. On the other hand, most other protocols do.
- Fifteen percent (15%) of Finding Words interviews result in false reports of sexual abuse.

"And Snider incorporated these points during her closing argument."

The court concluded that

"[Hall] made an informed decision not to include this line of attack in the first habeas action, because he concluded that Snider's actions in this regard were reasonable. This Court agrees."

The court then found that even if Hall and Snider should have called the expert witnesses, Nichols had not shown prejudice.

"[E]ven if this failure was considered deficient, there was little prejudice to Nichols. In reviewing Snider's closing argument, it is clear Nichols' primary defense theory was that the two minor victims were intentionally lying. *See Nichols*[ *II*, at] *1 (". . . but he [Nichols] claimed that the victims were lying."). In other words, Nichols' primary defense was not that the girls were overcome by the power of manipulation or suggestion during the forensic interviews. Rather, his defense was that the victims were lying, i.e., intentional or purposeful deception, thus rendering mostly irrelevant any claimed deficiencies in the forensic interviews."

The district court also noted that Kathie and Ballard would not have been able to testify that the victims were lying, only that there were deficiencies in the forensic interview.

11

On appeal, Nichols does not present an alternative claim that Hall should have located another independent witness to testify. He only addresses Hall's failure to fully evaluate the potential testimony of Kathie and Ballard and show that their testimony would have been more effective if called to the stand, not just used to create cross-examination questions. As the district court pointed out, Snider's cross-examination seemed to address all the concerns expressed by Kathie and Ballard with the forensic interview.

The district court's factual findings were supported by substantial competent evidence and these findings were sufficient to support the court's conclusions of law. Both Hall and Snider's decision not to call expert witnesses related to the forensic interview, and Hall's failure to pursue this argument in *Nichols II*, were reasonable trial strategies and therefore did not constitute ineffective assistance of counsel. In other words, Hall's representation was not deficient. That ends the inquiry.

But even if counsel's performance was deficient, because Snider was able to get all the necessary information about the unsupported Finding Words protocol before the jury during cross-examination, Nichols cannot establish prejudice beyond mere speculation. See, *Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland* prejudice is not established by mere speculation."); *Brownlee v. Haley*, 306 F.3d 1043, 1060 (11th Cir. 2002) ("'Speculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation.'").

2. *Hall's Failure to Call Witnesses*

   a. *The victims*

Nichols next claims that Hall was ineffective for not calling the victims to testify at the first K.S.A. 60-1507 hearing on Snider's ineffectiveness, so he could impeach their

12

"perjured" trial testimony related to counseling sessions that M.G. attended at the Guidance Center and DCF records. Snider testified that she did not use the DCF records to impeach the victims during the criminal trial because they contained information that would be damaging to Nichols' defense. *Nichols II*, 2017 WL 3327085, at *9.

Impeachment of a witness entails strategic calculations entrusted to a lawyer's professional judgment about what witnesses to call and how to conduct cross-examination. *State v. Butler*, 307 Kan. 831, 853-54, 416 P.3d 116 (2018).

At the hearing on Snider's ineffectiveness, Hall called the DCF worker that was assigned to investigate child abuse accusations to testify. She stated that she began an investigation in August 2006 related to an anonymous allegation of sexual abuse by Nichols against the same two victims in this case. The allegation was that the children "had a sticky, nasty discharge that [was] consistently in their underwear and that they were afraid of [Nichols]." The reporter indicated that "[Nichols] plays with the girls when they go to bed," and he tells them to be quiet and pretend to be asleep. Both girls, ages five and eight, denied anyone touching them in their private areas. Both interviews were 15 minutes or less. Hall tried to introduce evidence that C.W., the girls' mother, was made aware of these allegations, contrary to her testimony that she was shocked by the current allegations, but the court denied that evidence as hearsay.

With regards to the Guidance Center counseling records, Snider did not find out about their existence until the trial was underway and when they were revealed, she unsuccessfully moved for a mistrial. Nichols claims she should have been able to discover the victim's psychological records with due diligence. He claimed that "if '"she [had not] waived [his] preliminary hearing and [had] her private investigator uncover the matter,"' the fact that M.G. was in counseling would have been discovered." *Nichols II*, 2017 WL 3327085, at *8. But the *Nichols II* court pointed out that it was Nichols who

13

waived his preliminary hearing, not Snider. *Nichols II*, 2017 WL 3327085, at *8. With regards to the counseling evidence, the *Nichols II* court opined:

> "Nichols also believes that because M.G.'s counseling records did not indicate that she had received treatment for sexual abuse, he could have used this information to support his contention that the sexual abuse never occurred. This is a non sequitur, which means it does not follow. It is the fallacy of assuming an unproved cause. In other words, M.G. had not been abused sexually, for her counseling records did not indicate that she had been treated for sexual abuse. There is no connection between the claim and the evidence.

> "The only document Nichols admitted into evidence relating to M.G.'s counseling is her intake examination [occurring in December 2010, when she would have been 12]. Clearly, the absence of sexual abuse on the intake examination does not necessarily mean that M.G. never received sexual abuse counseling. Indeed, at his K.S.A. 60–1507 evidentiary hearing [claiming Snider's ineffectiveness], M.G.'s counselor stated that the sexual abuse had been discussed at some point during their counseling sessions." *Nichols II*, 2017 WL 3327085, at *8.

Basically, the *Nichols II* court concluded that there was no prejudice for failure to introduce the counseling report, because it would not have established that M.G. never received sexual abuse counseling as Nichols hoped it would. 2017 WL 3327085, at *8. In fact, M.G.'s counselor testified at the first K.S.A. 60-1507 hearing, and she shared that the initial diagnosis at intake was "adjustment disorder with depressed mood *and sexual abuse of child* with the focus on the victim." (Emphasis added.) She also noted that December 2010 was *her* first visit with M.G., but M.G. had received services at the Guidance Center before that date.

Here, the district court noted that the Court of Appeals had already determined that Snider was not ineffective for failure to impeach the victims with M.G.'s counseling records and the DCF report. The Court of Appeals had noted that the DCF report contained damaging evidence as it related to Nichols and the counseling records did not

14

prove that the victims were lying. The district court followed the same reasoning and found:

> "To the extent the Court of Appeals already determined that Snider's failure to utilize these two sources of information to impeach the victims did not constitute deficient performance, then Hall's failure to recall these witnesses to confront them with these records was not ineffective either."

Nichols objects to this approach:

> "This seems again to be a preconceived, circular notion, that because Hall didn't prove during the first 1507 proceeding that Snider was ineffective, he cannot be found ineffective either due to his own failures. If this is the case, what is the purpose of this Court's remand?
>
> . . . .
>
> "Once again, Hall is given a walk based on the circular argument that Snider's perceived effectiveness, which Hall failed to disprove (for whatever reason), takes Hall's performance out of the picture."

We disagree. After a thorough review the Court of Appeals held that Snider was not ineffective for failure to use the DCF report from August 2006 (the allegations of abuse were from May 2006-March 2010) and M.G.'s psychological records for impeachment of the victims. 2017 WL 3327085, *8-9. The court knew what was in those reports. Challenging that decision would simply mean submitting those same reports to another district judge to see if the judge felt—contrary to *Nichols II*—that they were helpful to Nichols' case and supported bringing the girls in to testify. That is no more than an attempt to relitigate an issue that was already decided based on a review by a court of all the same evidence in hopes of a different result.

Although Nichols filed a petition for review of *Nichols II*, it was denied and the mandate issued March 7, 2018. The decision and findings are final. But he claims, in

15

essence, that Hall should have disregarded that ruling and called the girls before another court, to be cross-examined on the same information in something akin to a hunting expedition. We agree with the district court. If Snider's failure to use these two reports to discredit the witness was a reasonable strategic decision, and we believe the evidence supports a conclusion that it was, a later attempt to assail that decision through his K.S.A. 60-1507 counsel is futile.

Hall's decision not to call the victims to testify at the K.S.A. 60-1507 hearing was also a strategic one. That ends our inquiry.

But even if Hall was ineffective, Nichols also fails to prove that the outcome of the case would have been different if this evidence had been presented. The district court's factual findings were supported by substantial competent evidence, and these findings were sufficient to support the court's conclusions of law.

   b. *A.H. and A.B.*

Nichols also claims that Hall was ineffective for failing to call A.H. and A.B. to testify at the first habeas hearing. These witnesses did testify at trial. Hall did not raise this issue at all in *Nichols II*.

As a little background, A.H. was a sixth grader at the time of the trial. She was called by the State as a witness. She is a cousin to the two victims, M.G. and T.H. She testified that they had confided in her about what Nichols had been doing to them. They explained some of the details and asked A.H. to keep it secret. They talked about it a few more times after the first time, and A.H. kept the secret. A.H. further testified that they never recanted to her.

16

A.B. was eleven years old at the time she testified in Nichols' trial. She too was a cousin to M.G. and T.H. M.G. confided in her about what Nichols had been doing to T.H. T.H. later told A.B. what Nichols had done to M.G. They asked her to keep it secret, but A.B. was torn because she knew this was something she should tell someone. She kept it a secret for a long time. She said she had gotten upset because Nichols' daughter had been spreading rumors around the school that M.G. was lying. The girls never told A.B. that they made this up. She is the one who apparently told a friend, who would then inadvertently let the cat out of the bag to M.G. and T.H.'s mother.

Nichols' reason for wanting these two girls to testify is unclear in both the K.S.A. 60-1507 motion in this case and in his appellate brief. In his brief his sole allegation is that "Nichols alleged the purpose in calling these witnesses was to impeach their trial testimony, which was that the girls disclosed the abuse to each of them individually." During the K.S.A. 60-1507 hearing, his sole comment about this claimed error was that A.H. needed to be called in so she could be questioned about the inconsistencies in "certain evidence she testified to." No further details were provided in either the hearing or the appellate brief. A point raised incidentally in a brief and not argued therein is deemed waived or abandoned. *State v. Meggerson*, 312 Kan. 238, 246, 474 P.3d 761 (2020).

But in an effort to understand Nichols' position, the inconsistencies alleged in his original motion in this case are as follows.

In his report, the detective recounted the interview with A.H. as follows:

- The girls were passing a yellow Post-it note back and forth between themselves and she kept asking them about what the note said and what they were talking about, and they didn't want to tell her at first. A.H. said she grabbed the note, and it said "'the things that he did to them.'"

17

- She was asked by the detective, "'specifically what kinds of things'" and she did not want to answer.
- She said she remembered the Post-it note had the word "'sex'" on it which she did not say but spelled out for the detective.
- M.G. and T.H. told her about things that Nichols did to them a lot.
- She said she did not think M.G. liked to talk about it because she said she did not like to talk about it.

But at trial A.H. testified:

- The girls were not playing with the Post-it note, it was just near to them.
- There were several Post-it notes, and she was reading them.
- T.H. told her what happened.

Nichols claims these stories are materially inconsistent, particularly when T.H. testified that she never spoke to A.H., but M.G. "must have." Yet Snider is the one who elicited this testimony in cross-examination.

As to A.B.'s testimony, in her interview with police A.B. said:

- M.G. never talked about anything that happened to her, only what happened to T.H.

But at trial A.B. testified:

- T.H. told her what things Nichols did to M.G., saying "[h]e did kind of the same—kind of the same thing to—[M.G.] that he did to [T.H.]."

18

T.H. also denied at trial that she ever spoke to A.B. and said it must have been M.G. Snider elicited this statement on cross-examination. Snider also elicited testimony from T.H. that she told no one at school and that Nichols never told her to keep any secrets. On the other hand, M.G. testified that she spoke to both A.B. and A.H. about what Nichols did and told them to keep it secret.

But Nichols claims that Snider's cross-examination of them—pointing out these inconsistencies—was ineffective and if Hall had called them to testify, eliciting from them the testimony Nichols thought should have been elicited during cross-examination—primarily prior inconsistent statements—it would prove Snider's ineffectiveness and change the result of the trial.

The district court rejected this claim.

> "It is generally up to defense counsel to decide whether and/or how to conduct a cross examination of a witness. *Sola-Morales*, 300 Kan. 887. In the instant case, Snider did conduct cross examinations of both witnesses, [A.H.] and [A.B.] Based on the transcripts, Snider was able to elicit from each witness at least one favorable piece of information that Snider was then able to effectively weave into her main theme that the victims were lying about the alleged abuse.
>
> "The Court does not believe it was necessary for Snider to point out every single inconsistency in their stories no matter how slight. Frankly, [A.H.] and [A.B.] were peripheral witnesses. And most of the inconsistencies identified by Nichols in his pro se memorandum are either trivial or not inconsistencies in the first place."

The district court concluded that Snider was not ineffective during her cross-examinations of A.H. or A.B. And even if her cross-examination was objectively unreasonable, Nichols has failed to demonstrate any prejudice. Likewise, if Snider's action of failing to adequately cross-examine these two witnesses was not ineffective, failure of Hall to raise this issue, could not be deemed ineffective.

19

We have no trouble finding that the district court's factual findings were supported by substantial competent evidence and these findings were sufficient to support the court's conclusions of law that Hall's presentation was not deficient.

    c. *Impeachment witnesses that did not testify at trial*

Nichols claims that Theresa Todd, Lacey Aufdemberge, T.S., and Theresa Aufdemberge, all had important impeachment testimony to offer from the letters they submitted to Snider before the trial.

We note that the testimony of most of these (who were all connected to Nichols in some way) dealt mainly with their concern that C.W. "sexualized her children" by exposing them to improper sexual language and material. Only the testimony from T.S. concerned an alleged recantation by M.G. on Facebook. Because these witnesses had the potential to affect the outcome of Nichols' trial, Nichols argued that Snider was ineffective for failing to call them. By the same logic, Hall could be seen as ineffective for not using the witnesses to show Snider's alleged ineffectiveness. It should be noted that Snider did call several witnesses at trial who said they heard or were told the victims were lying. So this testimony would have been somewhat cumulative.

But as Nichols concedes, in *Nichols III*, the Court of Appeals framed the issue on remand in the following way:  Was Hall ineffective for not calling certain witnesses "whom Nichols claim[ed] lied at trial" to confront them with their allegedly perjured trial testimony? *Nichols III*, 2021 WL 5445354, at *3. In other words, the scope of the mandate includes consideration of only those witnesses who testified during the criminal trial but were not called by Hall to testify at the first habeas hearing.

Nichols did not appeal the decision to limit the scope of the remand in *Nichols III*. The district court acknowledged that Hall's failure to call these witnesses at the first

habeas hearing fell outside the scope of the Court of Appeals' remand. "Aufdemberge, L.A., and T.S. did not lie during the trial because they never testified." Yet the district court found exceptional circumstances to consider Theresa Aufdemberge's letter.

Unfortunately, exceptional circumstances cannot support a district court's decision to expand the scope of an appellate mandate. An appellate court's mandate "shall be controlling in the conduct of any further proceedings necessary in the district court." K.S.A. 60-2106(c). District courts are required to execute further proceedings "according to the command of the appellate court made therein" K.S.A. 20-108. The Kansas Supreme Court has explicitly held that while different panels of the Court of Appeals may depart from the law of the case in exceptional circumstances, no exceptional circumstances permit a lower court to circumvent the mandate of a higher court. *Building Erection Svcs. Co. v. Walton Construction Co.*, 312 Kan. 432, Syl. ¶ 1, 475 P.3d 1231 (2020). This distinction holds true "even when a change in the law has occurred." *State v. Clark*, 313 Kan. 556, Syl. ¶ 7, 486 P.3d 591 (2021).

Because the district court was not allowed to expand the scope of the mandate, neither can we by reviewing the district court's findings on this issue. Nichols' claim fails.

In sum, considering the record as a whole, substantial competent evidence supports the district court's determination that Hall provided effective representation under the standards set forth in *Strickland*. Accordingly, the district court did not err in denying Nichols' K.S.A. 60-1507 motion.

Affirmed.